*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0358P (6th Cir.)
File Name: 00a0358p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DUSTIN W. SEAL,
　　　　　*Plaintiff-Appellee,*

　　　　　*v.*

ALLEN MORGAN,
Superintendent, Knox County
School (99-5090/5600);
KNOX COUNTY BOARD OF
EDUCATION (99-5600),
　　　　　*Defendants-Appellants,*

VICKI DUNAWAY, Principal,
Powell High School, et al.,
　　　　　*Defendants.*

Nos. 99-5090/5600

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 97-00267—James H. Jarvis, District Judge.

Argued: January 26, 2000

Decided and Filed: October 6, 2000

Before: NELSON, SUHRHEINRICH, and GILMAN,
Circuit Judges.

1

————————————

**COUNSEL**

**ARGUED:** Robert L. Crossley, Sr., CROSSLEY LAW FIRM, Knoxville, Tennessee, Mary A.R. Stackhouse, DEPUTY LAW DIRECTOR, BOARD OF EDUCATION, Knoxville, Tennessee, for Appellants. Laura E. Metcalf, LAW OFFICES OF TOMMY K. HINDMAN, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Robert L. Crossley, Sr., CROSSLEY LAW FIRM, Knoxville, Tennessee, Mary A.R. Stackhouse, DEPUTY LAW DIRECTOR, BOARD OF EDUCATION, Knoxville, Tennessee, John E. Owings, KNOX COUNTY LAW DIRECTOR'S OFFICE, Knoxville, Tennessee, for Appellants. Tommy K. Hindman, LAW OFFICES OF TOMMY K. HINDMAN, Knoxville, Tennessee, for Appellee.

GILMAN, J., delivered the opinion of the court, in which NELSON, J., joined. SUHRHEINRICH, J. (pp. 24-33), delivered a separate opinion dissenting in part.

————————————

**OPINION**

————————————

RONALD LEE GILMAN, Circuit Judge. In this action brought pursuant to 42 U.S.C. § 1983, Dustin Wayne Seal seeks monetary damages to compensate him for the Knox County Board of Education's 1996 decision to expel him from high school after a friend's knife was found in the glove compartment of Seal's car. Seal, who denied any knowledge of the knife's presence in the car while it was on school property, argues that the Board's action was irrational and violated his right to due process of law. The district court not only denied the motions for summary judgment filed by the Board and the Board's superintendent, but effectively entered summary judgment against both defendants on the issue of liability. For the reasons set forth below, we **AFFIRM** the judgment of the district court to the extent that it denied the

Board's motion for summary judgment, **REVERSE** the judgment of the district court to the extent that it entered summary judgment in Seal's favor on the issue of liability, and **REMAND** this case for further proceedings consistent with this opinion. With regard to Superintendent Morgan's appeal, we **REVERSE** the judgment of the district court and remand with instructions to enter summary judgment in his favor.

## I. FACTUAL BACKGROUND

In the fall of 1996, Seal was a junior at Powell High School in Knox County, Tennessee. On October 30, 1996, a friend of Seal's named Ray Pritchert, who was also a student at Powell High, became embroiled in an out-of-school dispute with another Powell High student who had begun dating Pritchert's ex-girlfriend. As a result, Pritchert started carrying around a hunting knife. The knife had a three-and-one-half inch blade and bore the inscription "Ray loves Jennie" (apparently Pritchert's ex-girlfriend). Seal knew that Pritchert had the knife, because Pritchert showed it to him that day. The next night, Seal went to pick up his girlfriend at her house, accompanied by Pritchert and another friend, David Richardson. Seal was driving his mother's car, because his own was not working. Pritchert, still carrying the knife, placed it on the floorboard of the car behind the driver's seat where Seal was sitting. When they arrived at the girlfriend's house, Seal went in to get her. Richardson, still in the car, placed the knife in the car's glove compartment. Whether Seal actually saw the knife when it was on the car's floorboard, or at any other point when the knife was in his mother's car, is not entirely clear from the record. It is, however, uncontroverted that Seal knew that Pritchert had been carrying a knife around, and that Pritchert had the knife on his person when he was in the car on October 31, 1996.

The following night was Friday, November 1, 1996. Seal, again driving his mother's car, drove his girlfriend and Pritchert to Powell High. All three were members of the Powell High band, and the Powell High football team had a

game scheduled that night. The three had worn their band uniforms, but were informed after entering the school that they would not be required to wear their uniforms that night. They then returned to the car, which Seal had parked in the Powell High parking lot, so that they could put on the clothes they had planned to wear after changing out of their band uniforms. After changing, Seal and Pritchert went back into the school building. There, the band director, Gregory Roach, pulled Pritchert aside and asked him if he and Seal had been drinking. Pritchert said that they had not. Roach let Seal and Pritchert enter the band room, because he did not smell alcohol on Pritchert's breath.

About fifteen minutes later, Roach summoned Seal and Pritchert to his office. There they were joined by Charles Mashburn, the vice-principal of Powell High. Mashburn announced that four students had reported seeing the two of them drinking alcohol. Although Mashburn searched both Seal's and Pritchert's coats and instrument cases, he found no evidence to suggest that either student had been drinking or possessed alcoholic beverages. Mashburn then announced that he needed to search Seal's car for a flask, because one of the assistant band directors said he saw either Seal or Pritchert with a flask, with both students chewing gum and checking the other's breath. Seal consented to the search. Mashburn did not find a flask. He did, however, find two cigarettes in a crumpled pack in the back of the car, a bottle of amoxicillin pills (an antibiotic for which Seal had a prescription) in the console, and Pritchert's knife in the glove compartment.

Mashburn subsequently had Seal accompany him to his office, where he directed Seal to write out a statement about what had just occurred. Seal asked Mashburn what he should write in the statement, and Mashburn replied that Seal should explain why the knife was in the glove compartment. Seal's entire statement reads as follows:

Went to Roach's office because he thought or had been told that we had a flask and had been drinking, so we went and Mr. Mashburn searched the car. He found a

that federal courts play a very limited role in public education, which is most properly left in the competent hands of state and local authorities.

For all of the foregoing reasons, I respectfully **DISSENT** as to III.A.

### IV.

The real problem here is that the majority does not approve of the manner in which the Board made its decision. Presumably the majority would be satisfied if the Board had explicitly stated that it did not believe Seal's after-the-fact denial, because: (1) Seal knew as of October 30, 1996, that his friend Pritchert was carrying a knife for protection because of a dispute with another PHS student; (2) Seal acquiesced to the presence of the knife in his car on October 31, 1996; (3) Seal drove Pritchert in his car to PHS on November 1, 1996; (4) Seal admitted in his signed confession taken that night that the knife was in the car because Seal and Pritchert felt "uneasy"; (5) it is entirely plausible that Seal and Pritchert would continue to feel uneasy on November 1, 1996, while attending a PHS function; (6) Seal did not state until after the fact that he did not know the knife was in the car on November 1, 1996; (7) there are no facts to support Seal's statement of lack of knowledge; and (8) because there are no facts to back his conclusion, the Board does not believe his statement. Had the Board's ruling followed this blueprint, we would not be remanding the matter to the district court for further proceedings. However, since the majority plans to remand for further proceedings, I think the only proper recourse in this case is to refer the matter back to the Board for more express fact findings on the issue of scienter or to simply allow the Board to present an affidavit concerning its findings. If the Board states that it disbelieved Seal, then there can be no trial, and judgment must be entered for the Board.

This case has far-reaching implications for school boards. School boards in this circuit should be on notice that, in attempting to implement weapons or drug policies, they must find scienter, and articulate those findings in a way that resembles the rulings of a federal district judge.

In any event, I am not prepared to hold school boards to the same standards as federal district courts. The majority has ignored the Supreme Court's admonitions in *Goss* and *Wood*

knife and 2 cigs. The knife was there because Ray's ex-girlfriend's boyfriend had been following us around with a few of his friends so we were a little uneasy.

Mashburn then prepared a form Notice of Disciplinary Hearing for Long-Term Suspension From School, charging Seal with possession of a knife, possession of tobacco, and possession of "pills." On November 6, 1996, Powell High's principal, Vicki Dunaway, conducted a disciplinary hearing. After hearing from both Seal and Mashburn, she suspended Seal pending expulsion for possession of a knife. It does not appear from the record that she took any action against Seal for his possession of the two cigarettes or the antibiotic pills. Seal appealed, and on November 14, 1996, Jimmie Thacker, Jr., the Board of Education's disciplinary hearing authority, conducted an appeal hearing.

Seal attended this hearing, as did his parents, his girlfriend, Principal Dunaway, and David Richardson (the student who had placed the knife in the glove compartment of the car belonging to Seal's mother). At the hearing, Seal testified that he knew that Pritchert had had the knife on his person on October 31, 1996, at a time when Seal was driving Pritchert around in his mother's car, but that he had no idea that the knife was in his car on November 1, or at any other time when the car was on school property. Richardson testified that Seal had not been in his mother's car when Richardson put Pritchert's knife in the glove compartment, and that as far as Richardson could tell, Seal did not know that the knife was there. Seal's girlfriend also testified that as far as she knew, Seal did not know the knife was in the glove compartment of his mother's car.

On November 18, 1996, Thacker notified Seal's mother by letter that he had decided to uphold Principal Dunaway's decision to suspend Seal pending expulsion by the Board. In pertinent part, the letter read as follows:

Testimony and written statements presented during the hearing place the knife in the glove compartment of the car your son was driving and which he parked on the

campus of Powell High School. Possession of a weapon on school property is a violation of Knox County Policy JCCC; therefore, I am upholding the principal's decision to suspend Dustin pending expulsion by the board of education.

The next day, Seal's mother telephoned school authorities to indicate that she and Seal wanted to appeal Thacker's decision to the Board. On November 22, 1996, Thacker notified Seal's mother by certified mail that the Board would consider the appeal of Seal's discipline for "possession of a weapon on school campus" at its next meeting.

The Board heard Seal's appeal on December 4, 1996. Seal was represented by counsel, who forcefully argued that Seal had no idea that the knife was in his mother's car either on November 1, 1996, or at any other time that the car was on school property. Board member Sam Anderson responded:

> My concern was because the . . . in our record it shows possession of a knife, possession of tobacco, possession of pills. You know, it doesn't just signify a weapon. And . . . you know . . . and either [sic] of the three are justification . . . .

Anderson then asked Seal whether he had ever seen the knife in his car. Seal said that he had not. He admitted that he knew that Pritchert had the knife the day before November 1, 1996—off school property—but insisted that he thought Pritchert had simply taken it with him, and that it had not been left in his mother's car. Anderson then explained that

> the problem I see is that we always have to be consistent in sending a clear message to students. Two or three years ago we were dealing with guns, guns, guns. Now, it's down to knives, knives, knives and I don't want to send a confusing message. Justin [sic], you are responsible for what's in your car and that's where I'm torn but I would have to say that you have to be held responsible as a driver for what's in your car. And that's a problem that you're going to have to deal with.

Seal also admitted in his confession that he knew the knife had been in the car for protection because he and Pritchert felt "uneasy." It was certainly plausible that the knife would be needed for protection at PHS on November 1, 1996, as well since the conflict that made them feel uneasy involved a fellow PHS student.

Most significantly, in his signed confession[5] taken on November 1, 1996, Seal did *not* state that he was unaware of the knife's presence. Rather, he stated that "the knife was there because [deleted] ex girlfriend's boyfriend had been following us around with a few of his friends so we were a little uneasy." From this statement, with its significant omission, made on the night in question and not after the fact, the Board could easily have concluded that Seal knew the knife was in the car on November 1, 1996. Given record evidence to support the Board's ruling, it is improper for this court to second-guess the Board's decision. The only statement to the contrary is Seal's statement made after he obtained an attorney. Seal offered no evidence to support that statement, however. This is an insufficient basis to overturn the Board's decision.

---

> . . . .
> [Judge Suhrheinrich]: But what bothers me in that he knew it was in the car and he never saw it being taken out.
>
> [Seal's Attorney]: Yes your Honor.

(Emphasis added).

[5]The majority rejects this characterization as well, preferring to refer to the November 1 statement as an "after-the-fact deduction." "After-the-fact" to what? The statement was given as an explanation for the knife's presence on school property on November 1, 1996. It was certainly not an "after-the-fact" deduction of the November 1 event, since Seal provided the statement that very evening at vice-principal Mashburn's behest. It is by no means a stretch to characterize the statement as a confession, because Seal acknowledged the weapon's presence.

affords the student an opportunity to rebut the presumption of scienter, thereby guaranteeing that the zero tolerance policy is reasonably applied. For this reason, there was no substantive due process violation.

## III.

The Board's decision is also rational because there is ample proof of scienter here. There is no question that the knife was in Seal's car when it was parked on the PHS parking lot on November 1, 1996. Seal admitted to the Board, and his attorney conceded at oral argument, that he knew the knife was in the car a few days prior to its discovery. He acquiesced to its presence in the car at that time. Seal also knew on October 31, 1996, that Pritchert intended to use the knife if threatened by his ex-girlfriend's boyfriend. Seal's attorney conceded during oral argument that Seal had no reason to believe the knife had been removed from the car.[4]

---

[4]The majority also disagrees with this characterization. This characterization was drawn from the following statements and colloquy at oral argument:

[Seal's Attorney]: The record has shown that Mr. Seal *did* know on October 30th [sic] that there was a knife in his mother's car. The knife belonged to Ray Pritchert, was placed in the car by Mr. Pritchert because of what had been going on with some other individuals at the school over this girl [indecipherable]. . . . .
[Judge Suhrheinrich]: So he knew the knife was in his car. What difference did it matter that he didn't know the exact location of the knife?

Seal's Attorney]: Well your Honor, I don't think he is saying that he knew the knife was in his car. It was not his knife.

[Judge Suhrheinrich]: No, I appreciate -- but I think there is certainly enough in there that he knew that knife was there and he never saw anybody take it out.

[Seal's Attorney]: *He didn't see anybody take it out*, but I think that what he would say was that he assumed it was taken out because it was not his knife.

At another Board member's suggestion, the Board then voted unanimously to rule on the appeal based on the record from the hearings conducted before Principal Dunaway and Disciplinary Hearing Authority Thacker. Anderson then made a motion to uphold Thacker's recommendation to expel Seal, which was approved unanimously. The entire transcript of the Board's proceedings as it relates to Seal spans three pages. In contrast, the transcript of the hearing conducted by Thacker is over fifty pages long.

In pertinent part, the Knox County Board of Education policy pursuant to which Seal was expelled provides that students may not "possess, handle, transmit, use or attempt to use any dangerous weapon [including knives] in school buildings or on school grounds at any time" and that students who are found to have violated the policy "shall be subject to suspension and/or expulsion of not less than one . . . year." The policy also provides that the Superintendent "shall have the authority to modify this suspension requirement on a case-by-case basis," although Superintendent Morgan has argued that it is "not clear" whether he has the power to modify a suspension or expulsion once it has been finally approved by the Board.

Generally, Tennessee law delegates to its local boards of education broad authority to formulate rules for student conduct and to prescribe appropriate remedies for the violation of those rules. *See* TENN. CODE ANN. § 49-6-4012(a). Before the 1996-97 school year, however, the Tennessee legislature directed each of its local school boards to develop and adopt, and to file annually with the state commissioner of education, written policies and procedures that would "impose swift, certain and severe disciplinary sanctions on any student" who, among other things, "brings a . . . dangerous weapon" onto school property, or "[p]ossesses a dangerous weapon" on school property. TENN. CODE ANN. § 49-6-4216(a)(2). Specifically, the legislature encouraged "[e]ach local and county board of education . . . to include within such policies and procedures a zero

tolerance policy toward any student who engages in such misconduct." TENN. CODE ANN. § 49-6-4216(b).

## II.  PROCEDURAL BACKGROUND

In April of 1997, Seal's father initiated an action on Seal's behalf in the United States District Court for the Eastern District of Tennessee pursuant to 42 U.S.C. § 1983.  After he reached the age of eighteen, Seal was substituted for his father as the plaintiff.  Seal claimed that his expulsion violated his rights under the Equal Protection and Due Process clauses of the Fourteenth Amendment, and that the search of his mother's car by Vice-Principal Mashburn violated the Fourth Amendment.  Initially, Seal named as defendants the principal, the hearing officer, and every member of the Knox County Board of Education.  The district court, however, dismissed on its own motion Seal's claims against all of these defendants, concluding that the only proper party defendants were Allen Morgan, the school district's superintendent, and the Board of Education itself.  None of these dismissals are at issue in these appeals.

Superintendent Morgan moved for summary judgment, asserting that he was entitled to qualified immunity as a matter of law.  The Board of Education also moved for summary judgment.  At the time these motions were filed, no discovery had been conducted.  Seal did not cross-move for summary judgment.  The district court concluded that both Superintendent Morgan and the Board were entitled to summary judgment on Seal's Fourth Amendment claim and Fourteenth Amendment equal protection claim, but that the Board was not entitled to summary judgment on Seal's Fourteenth Amendment due process claim.  In addition, the district court concluded that Superintendent Morgan was not entitled to summary judgment on the basis of qualified immunity.  The district court then set the case for trial on the issue of damages only, effectively deciding that Seal was entitled to summary judgment on his due process claim.  Superintendent Morgan appealed as of right from the denial of his motion for summary judgment on the basis of qualified

The Board, as part of its discretionary authority, was therefore free to infer from the facts of the case *sub judice* that Seal also knew that the knife was in his car the next night, because Seal knew that Pritchert began carrying a hunting knife as a result of a dispute with another PHS student and Seal drove Pritchert to PHS.  In light of the evidence and the Board's legitimate interest in preventing school violence, it was not irrational for the Board to expel Seal for possessing a knife in his car because it is undisputed that the knife was there on November 1, 1996.

The majority's ruling, in effect, means that there can be no such thing as  zero tolerance.  School boards in this circuit will, from today forward, have to include scienter a requirement in any such policy, even if the state does not impose such a condition on the enforcement of a weapons or drug policy.

## II.

Even if we assume that scienter is required, the majority's criticism of the Board's ruling is faulty because scienter can be imputed from the fact of possession.  Because Seal undisputedly possessed the knife, the Board could reasonably presume that Seal knew it was in his car.  At this point, the burden of persuasion shifted to Seal to explain why he did not know the knife was there.  Seal, and the hypothetical valedictorian were, after all,  in the best position to explain the situation.  The administrative due process hearings gave him the opportunity to rebut the presumption of scienter.  Seal failed to meet that burden here.  Seal offered no facts to show that he knew the knife had been removed from his car after it was placed there on October 31, 1996.  Thus, the Board's decision was rational because there was proof of scienter and a lack of evidence to rebut that presumption.  Furthermore, this burden of persuasion  makes the policy itself rationally related to the goal of preventing school violence because it

---

can be drawn but that they brought the knife to protect themselves should a fight with Pritcher's ex-girlfriend's boyfriend materialize?

automobile for use in a fight. As the General Assembly itself has recognized, children are entitled to a safe learning environment. Given the alarming increase in school violence nationwide, the Board's zero tolerance policy, enacted as part of a comprehensive network of state and local control over the schools, is not only rational but prudent.

The majority attempts to bolster its position with the hypothetical of the high-school valedictorian who, unknowingly, has a knife planted in his backpack by a vindictive student. The Board indicated at oral argument that an exception could be made to the zero tolerance policy in that situation. The majority seizes upon this statement as being "totally inconsistent with the Board's position in this case, which is that the Zero Tolerance Policy uniformly requires expulsion whenever its terms are violated." (Majority Op. at 14).

The majority's hypothetical assumes that the zero tolerance policy affords no discretion to the school administrators. Ironically, the majority would read a scienter requirement into the policy and read discretion out of the policy. Certainly, if at any stage of the proceedings, Seal or the mythical valedictorian provided a reasonable, believable, explanation for the weapon's presence that would end the matter. Furthermore, the analogy is inapt.[2] Here, unlike the unwitting valedictorian, Seal admittedly knew that the knife had been placed in his car on October 31, 1996 for use as a weapon.[3]

---

[2]A more apt comparison would be: "Friend hands knife to valedictorian to carry for protection. Valedictorian puts knife in his pocket. Unbeknownst to valedictorian, friend later moves knife to valedictorian's backpack, which valedictorian carries to school."

Like Seal, this valedictorian knew at some point that he had the knife on his person. The majority's comparison of Seal to the completely clueless valedictorian is a false analogy.

[3]The majority disagrees with this characterization. Yet, the majority does not, and cannot, dispute that Seal knew the knife was in the car on October 31, 1996 or that Seal explicitly stated that the knife was there because he and Pritchert felt "uneasy." What other possible conclusion

---

immunity, and the Board sought and received permission from the district court and this court to take an interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

## III. ANALYSIS

### A.   The Board

There is no abstract federal constitutional right to process for process's sake. *See Olim v. Wakinekona,* 461 U.S. 238, 250 (1983) (noting that "[p]rocess is not an end in itself."). Rather, the Fourteenth Amendment provides that one may not be deprived of life, liberty, or property without due process of law. State law determines what constitutes "property" for due process purposes. *See Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). It is undisputed that Seal enjoyed a property interest in his public high school education under Tennessee law. *See Goss v. Lopez,* 419 U.S. 565 (1975) (concluding that, in the absence of an emergency, public high school students cannot be suspended without the opportunity for a hearing). Tennessee not only provides its citizens with the right to a free public education, but requires them to attend school through the age of eighteen. *See* TENN. CODE ANN. § 49-6-3001.

Due process has two components. The first, procedural due process (often summarized as "notice and an opportunity to be heard"), is a right to a fair procedure or set of procedures before one can be deprived of property by the state. Even when it is clear that one is entitled to due process, "the question remains what process is due." *Goss,* 419 U.S. at 577 (citation omitted). The answer to the question of what process is due "depend[s] on appropriate accommodation of the competing interests involved." *Id.* at 579. In the context of disciplining public school students, the student's interest is "to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences." *Id.* Schools, of course, have an unquestionably powerful interest in maintaining the safety of their campuses and preserving their ability to pursue their educational mission. *See id.* at 580 ("Some modicum of discipline and order is essential if

the educational function is to be performed.  Events calling for discipline are frequent occurrences and sometimes require immediate, effective action.").

The district court rejected Seal's claim that he was denied procedural due process, concluding that he had received all of the process that he was due.  Even though Seal, in his brief on appeal, asserts that he was "owed both the substantive and procedural components of the due process law and was denied such," he does not really argue that the Board used unfair procedures before expelling him.  Rather, his complaint is with the substantive result—the ultimate decision to expel him.  His argument is thus one of substantive due process, the other component of due process.  In essence, Seal argues that the Board's ultimate decision was irrational in light of the facts uncovered by the procedures afforded him.

The Due Process Clause provides "heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997).  Government actions that burden the exercise of those fundamental rights or liberty interests are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest. *See United States v. Brandon,* 158 F.3d 947, 956 (6th Cir. 1998).  The list of fundamental rights and liberty interests—which includes the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, to terminate one's pregnancy, and possibly the right to refuse unwanted lifesaving medical treatment, *see Glucksberg*, 521 U.S. at 720 (citing cases)—however, is short, and the Supreme Court has expressed very little interest in expanding it. *See Glucksberg*, 521 U.S. at 721 ("[W]e have always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.") (citation, internal quotation marks, and brackets omitted).  In fact, the Supreme Court has held explicitly that the right to attend public school is not a fundamental right for

The statute now requires all boards of education to develop such policies:

(a) Prior to commencement of fall classes for the 1996-1997 school year, and annually thereafter, each local and county board of educaiton shall file with the commissioner of education written policies and procedures developed and adopted by the board:
   (1) To ensure safe and secure learning environments free of drugs, drug paraphernalia, violence and dangerous weapons; and
   (2) To impose swift, certain and severe disciplinary sanctions on any student
      (A) Who brings a drug, drug paraphernalia or a dangerous weapon onto a school bus, onto school property or to any school event or activity; or
      (B) Who, while on the school bus, school property or while attending any school event or activity:
         (i) Is under the influence of a drug; or
         (ii) Possesses a drug, drug paraphernalia or dangerous weapon; or
         (iii) Assaults or threatens to assault a teacher, student or other person.
*(b) Each local and county board of education is encouraged to include within such policies and procedures a zero tolerance policy toward any student who engages in such misconduct . . . .*

Tenn. Code Ann. § 49-6-4216 (1999) (emphasis added).

Let us remember that we are talking about dangerous weapons here, which the zero tolerance policy defined to include, *inter alia*, "any firearm, explosive, explosive weapon, Bowie knife, hawk bill knife, ice pick dagger, slingshot, switchblade knife, black jack knuckles . . . . "  All the defined weapons, including the weapon possessed by Seal, have the potential to kill or seriously injure a fellow student.  In fact, Seal admitted that the knife was placed in his

grave and even life-threatening dangers. . . .”).  The court system should not further hamstring the process of education by substituting its judgment on matters relating to the safety of students for that of school administrators and school board members.[1]

Indeed, the Board implemented the zero tolerance policy in recognition of its statutory duty to provide safe schools.  The Tennessee Constitution empowers the General Assembly to “provide for the maintenance, support and eligibility standards of a system of free public schools.”  Tenn. Const. art. XI, § 12.  The General Assembly’s authority concerning public education is in turn delegated to local boards of education which are vested with the power to dismiss students when the progress or efficiency of the schools makes such action necessary.  *See* Tenn. Code Ann. § 49-2-203(a)(8).  Tennessee also delegates broad authority to its local boards of education to formulate a code for student conduct and to prescribe remedies for the violation of those rules.  *See* Tenn. Code Ann. § 49-6-4012(a).

The General Assembly seeks “to secure a safe environment in which the education of the students of Tennessee may occur.”  Tenn. Code Ann. § 49-6-4203(a),(b).  In 1996, the General Assembly reacted to the growing incidents of school violence by amending the School Security Act to encourage zero tolerance policies for students who possess dangerous weapons on campus.  *See* Tenn. Code Ann. § 49-6-4216(b).

---

[1] The majority argues that “[n]o student can use a weapon to injure another person, to disrupt school operations, or, for that matter, any other purpose if the student is totally unaware of its presence.”  (Maj. Op. at 12.)  Aside from the fact that the majority is again improperly substituting its assessments for those of the Board’s, I disagree with this proposition.  Even if the student who brought the weapon onto school property was unaware of its presence, another student could find the weapon and use it to cause injury.  For example, even if the Board believed that Seal did not know the weapon was in the car on November 1, 1996, Pritchert knew it was there and presumably would have used it to injure another student had he felt threatened.

the purposes of due process analysis.  *See San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 33-37 (1973);  *see also Smith ex rel. Smith v. Severn,* 129 F.3d 419, 429 (7th Cir. 1997) (rejecting due process and equal protection challenges to a school suspension, noting that “[t]he question of whether a public education is a fundamental right is not a novel one.”).

The Supreme Court has also recognized the uniquely destructive potential of overextending substantive due process protection.  *See Glucksberg,* 521 U.S. at 720 (observing that extending substantive due process protection to an asserted right or liberty interest “place[s] the matter outside the arena of public debate and legislative action,” and reasoning that “the utmost care” must therefore be exercised before breaking new ground, “lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of this Court.”). Indeed, the Court has specifically cautioned that “[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint,” and that “[b]y and large, public education in our nation is committed to the control of state and local authorities.”  *Goss,* 419 U.S. at 578 (quoting *Epperson v. Arkansas,* 393 U.S. 97, 104 (1968)); *see also Dunn v. Fairfield Community High Sch. Dist. No. 225,* 158 F.3d 962, 966 (7th Cir. 1998) (expressing concern about the prospect of allowing the due process clause to “transform[] the federal courts into an appellate arm of the schools throughout the country”).

Government actions that do not affect fundamental rights or liberty interests and do not involve suspect classifications will be upheld if it they are rationally related to a legitimate state interest.  *See Vacco v. Quill,* 521 U.S. 793 (1997) (applying the rational basis standard of review to uphold New York’s statutes outlawing assisted suicide, which neither infringe fundamental rights nor involve suspect classifications).   In the context of school discipline, a substantive due process claim will succeed only in the “rare case” when there is “no ‘rational relationship between the punishment and the offense.’”  *Rosa R. v. Connelly,* 889 F.2d

435, 439 (2d Cir. 1989) (concluding that substantive due process did not require a student to be credited with "time served" while the student was out of school awaiting expulsion proceedings that were postponed at the student's request) (quoting *Brewer v. Austin Indep. Sch. Dist.,* 779 F.2d 260, 264 (5th Cir.1985)); *see also Wood v. Strickland,* 420 U.S. 308, 326 (1975) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.").

That said, suspending or expelling a student for weapons possession, even if the student did not knowingly possess any weapon, would not be rationally related to any legitimate state interest. No student can use a weapon to injure another person, to disrupt school operations, or, for that matter, any other purpose if the student is totally unaware of its presence. Indeed, the entire concept of possession—in the sense of possession for which the state can legitimately prescribe and mete out punishment—ordinarily implies knowing or conscious possession. *See* WAYNE R. LAFAVE & AUSTIN R. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 3.2, at 279 (1986 & Supp. 2000) (noting that "[f]or legal purposes other than criminal law—e.g., the law of finders—one may possess something without knowing of its existence, but possession in a criminal statute is usually construed to mean conscious possession") (footnotes omitted); *see also United States v. Lewis,* 701 F.2d 972, 973 (D.C. Cir. 1983) (Bork, J.) (observing that in order to withstand a motion for judgment of acquittal on the charge of constructive possession of an illegal firearm, the government must introduce sufficient evidence for a reasonable jury to conclude "that the possession was 'knowing'") (citation omitted); *United States v. Sawyer,* 294 F.2d 24, 29 (4th Cir. 1961) (noting, in a prosecution for unlawful possession of inventory for liquor bootlegging, that "possession, when charged as a crime, must be conscious"); *State v. Rice,* 374 A.2d 128, 132 (Conn. 1976) (concluding, in a prosecution for unlawful carrying of a firearm in a motor vehicle, that constitutional due process requires the government to prove the defendant's knowing possession of the firearm); *State v. Labato*, 80 A.2d 617, 622

## I.

First of all, the Board's decision was rational because the zero tolerance policy does not contain an express scienter requirement. By holding that "[s]uspending or expelling a student for possessing a weapon, even if that student did not knowingly possess the weapon, would not be rationally related to any state interest," the majority has improperly substituted its interpretation of the regulation for the School Board's. As *Wood* indicates, however, the Board's construction of its regulations is entitled to deference. *See id.*

Nor is it irrational to interpret the zero tolerance policy as the Board did. In addition to their duty to educate, schools act *in loco parentis.* Given this enormous responsibility, and the potentially devastating consequences of weapons on campus, a strict weapons policy is rationally related to a legitimate government interest – protecting our children from the very real threat of violence. The Columbine High School massacre and other school shootings have, unfortunately, become part of the national consciousness. The Knox County schools themselves are not immune from the threat of violence. Their disciplinary records show twenty injuries as a result of knives and sharp weapons in the three years preceding Seal's expulsion. Given this national and local landscape of violence, it is perfectly rational to establish a strict zero tolerance policy to ensure students' safety.

The Supreme Court has recognized the growing concern over school violence and the "substantial interest" of schools in maintaining discipline on campus. *See New Jersey v. T.L.O.*, 469 U.S. 325, 339 (1985) ("Maintaining order in the classroom has never been easy, but in recent years, school disorder often has taken a particularly ugly form: drug use and violent crime in the schools have become major social problems."); *see also Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ.*, 158 F.3d 361, 378-79 n.23 (6th Cir. 1998) ("Indeed, we do not have to search beyond recent local and national media headlines to understand that schools are, unfortunately, too often turned into places in which children are subjected to

---

**DISSENTING IN PART**

---

SUHRHEINRICH, Circuit Judge, dissenting in part. As the majority acknowledges, the right to attend a public school is not a fundamental right for purposes of a due process analysis. A school's disciplinary decision will therefore survive a constitutional substantive due process challenge if it is rationally related to a legitimate government purpose. *See Washington v. Glucksberg*, 521 U.S. 702, 728 (1997). Furthermore, as the majority notes, the Supreme Court has specifically cautioned that "[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint," and that "[b]y and large, public education in our nation is committed to the control of state and local authorities." *Goss v. Lopez,* 419 U.S. 565, 578 (1975) (quotation omitted). Thus,

> [i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. Public high school students do have substantive and procedural rights while at school. But *§ 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations.* The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal-court corrections of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.

*Wood v. Strickland*, 420 U.S. 308, 326 (1975) (emphasis added). The majority ignores these principles in holding that the Board acted irrationally in expelling Seal.

(N.J. 1951) (noting in a criminal prosecution for possession of illegal lottery tickets, that the state legislature could legitimately abrogate the common law requirement of scienter, or evil intent, and impose criminal liability on persons who did not know that their possession of the tickets was illegal, but could not abrogate the requirement that the persons intentionally possessed the tickets).

We would have thought this principle so obvious that it would go without saying. The Board, however, devotes a great deal of the discussion in its briefs to arguing that "scienter" is not required by its "Zero Tolerance Policy," and that the criminal law requirement that possession of a forbidden object be knowing or conscious possession is a "technicality" that should not be "transported into school suspension cases." Frankly, we find it difficult to understand how one can argue that the requirement of conscious possession is a "technicality." *Cf. Morissette v. United States*, 342 U.S. 246, 250 (1952) ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty . . . to choose between good and evil.").

We asked counsel at oral argument whether the Board was seriously arguing that it could expel a student for unconsciously possessing a dangerous weapon, posing a hypothetical example involving a high-school valedictorian who has a knife planted in his backpack without his knowledge by a vindictive student. The question was whether the valedictorian would still be subject to mandatory expulsion under the Board's Zero Tolerance Policy, even if the school administrators and the Board members uniformly believed the valedictorian's explanation that the knife had been planted. Counsel for the Board answered yes. After all, counsel argued, the Board's policy requires "Zero Tolerance," and the policy does not explicitly *say* that the student must know he is carrying a weapon. Only after the Board's counsel sensed—correctly—that this answer was very difficult to

accept did counsel backtrack, suggesting that perhaps an exception could be made for our unfortunate hypothetical valedictorian. We find it impossible to take this suggestion seriously, however, and not simply because counsel had just finished arguing the opposite. The suggestion is totally inconsistent with the Board's position in this case, which is that the Zero Tolerance Policy uniformly requires expulsion whenever its terms are violated.

Contrary to the Board's assertion, the criminal law requirement that possession of contraband must be conscious or knowing is neither arcane nor unsettled. The Board's reliance on *Morissette v. United States,* 342 U.S. 246 (1952), is completely misplaced. *Morissette* was a prosecution for conversion of government property (spent bomb casings), in which the statute omitted any mention of a culpable state of mind being required for conviction. There was no question that Morissette had intentionally picked up the bomb casings, carried them away, and sold them, and that he knew that he was in possession of the casings when he carted them off. *See id.* at 247-48. Morissette argued, however, that he thought—mistakenly—that the bomb casings were abandoned property, "unwanted and considered of no value to the Government." *Id.* at 248. The district court concluded that the only intent that mattered was Morissette's intent to take the bomb casings, and instructed the jury that if it found that Morissette had intended to take the bomb casings (Morissette himself admitted that he had), it was required to convict. *See id.* at 249. Given essentially no choice by the district court's instructions, the jury convicted Morissette, and this court affirmed.

The Supreme Court reversed, refusing to infer from Congress's omission regarding culpability an affirmative intention to impose strict criminal liability and, thus, to "sweep out of all federal crimes, except when expressly preserved, the ancient requirement of a culpable state of mind." *Id.* at 250. Although the Court acknowledged that there might not be a "precise line" separating traditional crimes, for which intent would be presumed to be an element,

trivial period . . . is a serious event in the life of the suspended child.") (internal quotation marks and citation omitted). We understand full well that the decision not to expel a potentially dangerous student also carries very serious potential consequences for other students and teachers. Nevertheless, the Board may not absolve itself of its obligation, legal and moral, to determine whether students intentionally committed the acts for which their expulsions are sought by hiding behind a Zero Tolerance Policy that purports to make the students' knowledge a non-issue. We are also not impressed by the Board's argument that if it did not apply its Zero Tolerance Policy ruthlessly, and without regard for whether students accused of possessing a forbidden object knowingly possessed the object, this would send an inconsistent message to its students. Consistency is not a substitute for rationality.

For the reasons set forth above, we **AFFIRM** the judgment of the district court to the extent that it denied the Board's motion for summary judgment, **REVERSE** the judgment of the district court to the extent that it entered summary judgment in Seal's favor on the issue of liability, and **REMAND** this case for further proceedings consistent with this opinion. With regard to Superintendent Morgan's appeal, we **REVERSE** the judgment of the district court and remand with instructions to enter summary judgment in his favor.

not believe that the contours of that right were sufficiently clear to put a reasonable school superintendent on notice in 1996 that a school disciplinary policy's lack of a conscious-possession requirement could produce irrational expulsions and thus violate the legal rights of students expelled under the policy. For this reason, we will reverse the judgment of the district court to the extent that it denied Superintendent Morgan's motion for summary judgment, and remand with instructions to enter summary judgment in his favor.

For the future, however, we expect that our opinion today will clarify the contours of a student's right not to be expelled for truly unknowing or unconscious possession of a forbidden object. *See Daughenbaugh*, 150 F.3d at 603 (noting that an on-point appellate court decision can put future defendants on notice that certain specific types of conduct will violate clearly established legal rights). Because we have concluded that Superintendent Morgan was entitled to summary judgment on the basis of qualified immunity, we need not and do not address the question—which Superintendent Morgan's counsel conceded at oral argument was "not clear"—of whether he had the authority to disturb the decision to expel Seal once it was finally made by the Board.

## IV. CONCLUSION

We would not for a minute minimize the Board's obligation to maintain the safety of its campuses, and its right to mete out appropriate discipline (including expulsion) to students who commit serious violations of its rules. But we cannot accept the Board's argument that because safety is important, and because it is often difficult to determine a student's state of mind, that it need not make any attempt to ascertain whether a student accused of carrying a weapon knew that he was in possession of the weapon before expelling him.

The decision to expel a student from school is a weighty one, carrying with it serious consequences for the student. *See Goss*, 419 U.S. at 576 ("[E]ducation is perhaps the most important function of state and local governments, and the total exclusion from the educational process for more than a

and so-called public welfare or regulatory offenses, for which criminal liability without intent could be imposed, the Court refused to accept that larceny-type offenses were near the boundary. Indeed, the Court surveyed the state courts of last resort, "on whom fall the heaviest burden of interpreting criminal law in this country," and could not identify a single state court that had dispensed with the requirement of intent for larceny-type offenses. *See id.* at 260-61.

At oral argument, counsel for the Board also referred to an unspecified recent case involving the illegal possession of assault weapons, presumably *Peoples Rights Organization v. City of Columbus*, 152 F.3d 522 (6th Cir. 1998). Suffice it to say that *Peoples Rights Organization* does not support the Board's position. In that case, this court concluded that a Columbus, Ohio city ordinance prohibiting the possession of "assault weapons" imposed strict criminal liability. *Id.* at 534. The actual holding of *Peoples Rights Organization*, however, was that much of the ordinance, including its definition of "assault weapon," was unconstitutionally vague, and was thus "little more than a trap for the unwary." *Id.* at 535.

In any event, "strict liability" in the context of a weapons-possession statute at most means that the government would not need to prove that the defendant knew he was violating the law, or that the weapon possessed the attributes that make it a specific type of weapon—an assault weapon or machine gun, for example—that is likely the subject of heavy regulation or prohibition. But nothing in *Peoples Rights Organization* even remotely suggests that a defendant can be convicted for the unknowing possession of an item that is later revealed to be a statutory "assault weapon" or "machine gun." *Cf. United States v. Staples*, 511 U.S. 600, 606 (1994) (relying on *Morissette*, among other cases, for the proposition that because "offenses that require no mens rea" are disfavored, "some indication of congressional intent . . . is required to dispense with mens rea as an element of a crime," and refusing to interpret the federal statute criminalizing the unlicensed possession of machine guns as permitting

convictions without proof that the defendant knew that the weapon had the specific characteristics that make it a statutory "machine gun").

The Board is, of course, correct when it observes that this is not a criminal case, and that its decision to expel Seal is not vulnerable to a substantive due process attack unless it is irrational. We believe, however, that the Board's Zero Tolerance Policy would surely be irrational if it subjects to punishment students who did not knowingly or consciously possess a weapon. The hypothetical case involving the planted knife is but one illustration of why.

Another example would be a student who surreptitiously spikes the punch bowl at a school dance with grain alcohol, with several students, none of whom having any reason to know that alcohol has been added to the punch, taking a drink. Suppose that the school has a code of conduct that mandates suspension or expulsion for any student who possesses or consumes alcohol on school property, but does not specifically provide that the alcohol must be knowingly possessed or consumed. Under the Board's reasoning, the student who spiked the punch bowl would of course be subject to suspension or expulsion, but so would any of the students who innocently drank from the punch bowl, even if the school board was completely convinced that the students had no idea that alcohol had been added to the punch. Suspending the students who drank from the punch bowl, not realizing that alcohol had been added, would not rationally advance the school's legitimate interest in preventing underage students from drinking alcohol on school premises any more than suspending a handful of students chosen at random from the school's directory.

A student who knowingly possesses a weapon and is caught with it can, of course, be lying when he or she claims not to have known of its existence. Simply because a student may lie about what he knew, however, does not mean that it is unnecessary to address the question of what he knew before meting out punishment. The Board, for its part, freely

judgment motion, and that doing so is particularly appropriate when the factual record upon which summary judgment is sought has been expanded). The district court's other option would be to conduct a trial on the issues of liability and damages. At trial, the determination of whether the Board's action was rationally related to a legitimate state interest is one of law and would be made by the court. The questions of what the Board did, and why, would be questions of fact for the jury. *See Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 591 (3d Cir. 1998) (noting that the question of whether a governmental action is rationally related to a legitimate state interest is properly decided by the court, although questions regarding the state officials' motivation, if the subject of a genuine dispute of fact, are for the jury).

## B. Superintendent Morgan

The doctrine of qualified immunity generally shields government officials from civil liability for performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."). In determining whether an official is entitled to qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Daughenbaugh v. Tiffin*, 150 F.3d 594, 602-03 (6th Cir. 1998) (citation and internal quotation marks omitted).

As an abstract matter, the right of public school students not to be expelled arbitrarily or irrationally has been clearly established since at least the Supreme Court's decision in *Goss v. Lopez*, 419 U.S. 565 (1975), which held that long-term suspensions and expulsions must comport with minimal standards of due process. More concretely, however, we do

liability. It did this even though Seal had not moved for summary judgment. In appropriate circumstances, we acknowledge that a district court may enter summary judgment against the moving party in the absence of a cross-motion. *See, e.g.*, *Rogers v. Management Tech., Inc.*, 123 F.3d 34, 38 (1st Cir. 1997) (explaining that "[t]he major limitation on this rule is that 'the losing party' must be 'on notice that she had to come forward with all of her evidence.'") (citation omitted); *Martinson v. Massachusetts Bay Ins. Co.*, 947 F. Supp. 124, 127 (S.D.N.Y. 1996) (entering summary judgment in favor of the non-moving defendant and against the plaintiffs, who had moved for summary judgment); *see also* 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 346-53 (3d ed. 1998 & Supp. 2000).

In the present case, however, we do not believe that this disposition was appropriate. As noted above, one cannot determine conclusively from the record in its present state why Seal was expelled. We do not believe that a reasonable factfinder would be compelled to find that the Board expelled him for an irrational reason, i.e., without making any determination of whether Seal consciously possessed the knife, or despite believing Seal's explanation that he did not. The Board might conceivably be able to show that it expelled Seal for a reason that would have to be accepted as rational. Accordingly, we will affirm the judgment of the district court to the extent that it denied the Board's motion for summary judgment, reverse the judgment of the district court to the extent that it entered summary judgment against the Board on the issue of liability, and remand the case for further proceedings.

On remand, the district court could, as an exercise of its discretion, permit discovery and allow the Board to renew its motion for summary judgment, supplemented by appropriate affidavits or other evidence. *See, e.g.*, *Whitford v. Boglino,* 63 F.3d 527, 530 (7th Cir.1995) (noting that a district court has the discretion to entertain a successive or renewed summary

concedes that "the record does not reflect what the Board did or did not consider with respect to [Seal's] knowledge," but argues that "[i]n the absence of findings of fact [by the Board], it ought not be concluded that the Board failed to consider [Seal's] knowledge."

Well, why not? The Board's attorney has insisted that Seal's knowledge was completely irrelevant, and that the Board's Zero Tolerance Policy required Seal's expulsion regardless of whether he knew the knife was in his car. At the Board meeting during which the Board voted to expel Seal, Board Member Sam Anderson, who as far can be determined from the record is the only person having anything to do with the decision to expel Seal who even considered the question of what Seal did or did not know, suggested that it would send a "confusing message" to do anything besides expel Seal, regardless of whether Seal had any idea that the knife was in his car. Then again, he also apparently thought that Seal could have been expelled just as easily for having a prescription antibiotic in his car.

In the case before us, we must remember that it was the Board, not Seal, that moved for summary judgment. As the non-moving party, Seal was entitled to have all reasonable inferences drawn in his favor. *See* FED. R.CIV. P. 56(c). The absence of any evidence about what the Board concluded regarding Seal's knowledge is exactly why the Board is *not* entitled to summary judgment. In this regard, we disagree with the dissent's characterization that "Seal admittedly knew that the knife had been placed in his car on October 31, 1996 for use as a weapon" (Dissenting Op. at 28) and that "Seal's attorney conceded during oral argument that Seal had no reason to believe the knife had been removed from his car." (Dissenting Op. at 30). What Seal's attorney said was that Seal did not specifically see anyone pick the knife up off the floor of the car and remove it. Seal himself testified that he assumed that when Pritchert left Seal's car, Pritchert took his knife with him.

Similarly, the record provides no clue as to how the Board viewed Seal's written statement to Vice-Principal Mashburn on the night in question. Was it a confession (as characterized by the dissenting opinion at page 31), or was it an after-the-fact deduction (as Seal insists) by Seal about how and when the knife must have gotten into the glove compartment. The dissent apparently concludes that the Board could rationally have decided that the statement was a confession, even though there is absolutely no indication in the record that this is what the Board actually decided.

We also find ourselves unable to take much comfort in the Board's frequent reminders in its brief and at oral argument that it afforded Seal a number of hearings, expending a significant amount of time in the process, before expelling him. Indeed, one could just as easily view this case as a challenge to the Board's procedures, the obvious defect in which is that they make no attempt to separate out students who knowingly possessed a weapon on school property from those who did not. Based on the evidence of record, it appears that nothing that Seal could have said at any of those hearings would have made one bit of difference. Because there was no dispute that the knife was in Seal's car when on school property, the Board insists that it was required under its Zero Tolerance Policy to expel Seal, whether or not he had any idea that the knife was in his car. We are prepared to take the Board at its word.

A school board can, of course, disbelieve the student's explanation and conclude that the student knowingly violated school policies. If that occurs, due process would be satisfied as long as the procedures afforded the student were constitutionally adequate and the conclusion was rational. The Board argues that the district court "erred by substituting its own view of the facts for that of the Hearing Officer and the Board of Education." Again, this begs the question—which nothing in the record answers—of what the views of the hearing officer and the Board were. Did the Board expel him because it disbelieved Seal's explanation, did it expel him despite believing his explanation completely,

or did it expel him without deciding the issue, in the belief that Seal's knowledge was simply irrelevant to the decision? Of these possibilities, the first one would have been permissible if rationally supported by the record, but the other two would not have been.

It may be correct, as the Board argues, that as a matter of "state law, case law or its own rules," the Board is not required to make formal findings of fact in expulsion cases. As a matter of federal constitutional law, however, the Board may not expel students from school arbitrarily or irrationally. To accept the Board's argument would be to allow it to effectively insulate itself even from rational basis review, as long as the decision the Board reached *might* have been rational. What is at issue in the present case, however, is not whether the Board *could* have made a decision that would have been rationally related to a legitimate state purpose, but whether it actually did so.

The fact that we must defer to the Board's rational decisions in school discipline cases does not mean that we must, or should, rationalize away its irrational decisions. And when it is not clear that the Board's decision was rational, because it is impossible to conscientiously determine from the record what the Board's actual decision was, then the Board, as well as other school boards with similar "Zero Tolerance" policies, should not be entitled to summary judgment in civil rights actions arising from their decisions to impose long-term suspensions and expulsions.

On the basis of the record presented, a reasonable trier of fact could conclude that Seal was expelled for a reason that would have to be considered irrational. We therefore conclude that the district court correctly denied the Board's motion for summary judgment.

The district court, however, did more than deny the Board's motion for summary judgment. By ordering that the case "proceed to trial by jury . . . only to determine the amount of damages to be awarded" to Seal, the district court effectively entered summary judgment *against* the Board on the issue of