*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0169P (6th Cir.)
File Name: 04a0169p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

RHYS WILLIAMS, a minor, by
his mother and next friend,
Gail Allen, et al.; GAIL
ALLEN; DAVID ALLEN,
          *Plaintiffs-Appellants*
               *(02-3200),*

ZACHARY DURBIN, a minor;
BOBBI LACROSS,
          *Plaintiffs-Appellants*
               *(02-3207),*

          *v.*

CAMBRIDGE BOARD OF
EDUCATION, et al.,
          *Defendants-Appellees.*

Nos. 02-3200/3207

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 00-00388—Algenon L. Marbley, District Judge.

Argued: July 31, 2003

Decided and Filed: June 4, 2004

Before: DAUGHTREY, MOORE, and SUTTON, Circuit
Judges.

———————————

## COUNSEL

**ARGUED:** James D. McNamara, Columbus, Ohio, Mark E.
Jurkovac, Columbus, Ohio, for Appellants. Brian M. Zets,
SCHOTTENSTEIN, ZOX & DUNN, Columbus, Ohio, Mark
D. Landes, ISAAC, BRANT, LEDMAN & TEETOR,
Columbus, Ohio, Richard W. Ross, MEANS, BICHIMER,
BURKHOLDER & BAKER CO., Columbus, Ohio, for
Appellee. **ON BRIEF:** James D. McNamara, Columbus,
Ohio, Mark E. Jurkovac, Rick J. Abraham, Columbus, Ohio,
for Appellants. Brian M. Zets, SCHOTTENSTEIN, ZOX &
DUNN, Columbus, Ohio, Mark D. Landes, John S. Higgins,
ISAAC, BRANT, LEDMAN & TEETOR, Columbus, Ohio,
Richard W. Ross, MEANS, BICHIMER, BURKHOLDER &
BAKER CO., Columbus, Ohio, for Appellee.

SUTTON, J., delivered the opinion of the court, in which
DAUGHTREY, J., joined. MOORE, J. (pp. 25-45), delivered
a separate opinion dissenting in part and concurring in part.

———————————

## OPINION

———————————

SUTTON, Circuit Judge. On April 20, 1999, fourteen
students and one teacher were killed at Columbine High
School in Littleton, Colorado. Two students at the school, we
eventually learned, were responsible for the killing spree.

On Friday, April 23, 1999, three days after Columbine, a
trio of students at Cambridge Junior High School in
Cambridge, Ohio reported to the Vice-Principal of the school

that Rhys Williams and Zach Durbin planned to commit acts of violence at the school. Rhys and Zach had prior criminal records and both were then on juvenile probation. After interviewing the three students, after taking written statements from each of them, after interviewing Zach Durbin (the only one of the two boys at school that day) and after consulting with probation officers, school officials initiated "emergency remov[al]" proceedings against the two students. As a result, juvenile parole officers took both students into custody at a juvenile detention facility for the weekend. On the following Monday morning, the juvenile court placed both students on house arrest for several days, and they did not return to school for ten days in Zach's case and for several days in Rhys's case. According to school officials, the boys stayed home through voluntary decisions of their parents. According to the boys' parents, the school suspended them for these periods of time. The juvenile prosecutor ultimately did not file charges against Rhys Williams, but he did file an aggravated menacing charge against Zach Durbin. In September 1999, Zach was acquitted of the charge.

In the aftermath of the arrests, the boys and their parents filed constitutional tort claims under 42 U.S.C. § 1983 (along with several state-law claims) against the relevant school officials and law enforcement officers. In particular, they contended (1) that the local officials failed to establish probable cause for the arrests in violation of the Fourth Amendment and (2) that the two boys received school suspensions without due process in violation of the Fourteenth Amendment. The district court rejected these claims and several others as a matter of law. We affirm.

## I.

### A.  Events Preceding the April 23rd Arrest

In April 1999, Rhys Williams and Zach Durbin were fourteen years old and were in the eighth grade at Cambridge

Junior High School. Both students had previous criminal problems and were on juvenile probation in April 1999. Rhys also had been disciplined by the school for several incidents of threatening behavior.

On Wednesday, April 21, 1999, one day after the Columbine tragedy, the two boys went to Rhys's house. While there, they watched television coverage of the Columbine shootings with Rhys's mother, Gail Allen. At some point that afternoon, Rhys asked his mother what she would do if Rhys and Zach did "something like that." JA at 469 (Durbin Dep.).

Later that night Zach spoke with a classmate, Kayla Hollins, on the telephone. According to Zach, he merely told Kayla about his conversation with Rhys and Gail Allen earlier in the day. According to Kayla, Zach told her that he was "getting sick of the way things were going" and was planning on bringing a gun to school or bombing the school. JA at 252 (Hollins Test.). Kayla alleged that Zach also said he would kill the "preps" first, JA at 147 (Hollins Recorded Statement)—meaning that he would kill Sadie LePage and that Kayla would be "one of the first to go," JA at 532 (Hollins Dep. I)—but that he would not hurt Katie Spittle because he liked her, JA at 151 (Hollins Written Statement).

### B.  Friday, April 23, 1999

#### 1.  Zach Durbin

On Friday morning of that week, two days after her conversation with Zach, Kayla wrote a note to Sadie LePage, saying that Zach "was going to bring a gun to school and shoot us all because he was sick of bitchy preps." JA at 152 (LePage Written Statement). Sadie showed the note to Katie Spittle, another classmate. During the lunch period, Sadie and Katie asked Zach whether the contents of the note were true, and he allegedly told them they were, a point that Zach

disputes. After lunch, Sadie and Katie told school officials about the threat. They first told Julie Orsini, the guidance counselor, about the note that Kayla had written. Orsini notified Vice-Principal William Howell about the matter and relayed her impression that the girls were "visibly shaken up [and] . . . feeling threatened." JA at 576 (Howell Dep.). Howell met with Sadie and Katie individually, and later called Kayla to his office as well. All three girls spoke to Howell about what had happened, then wrote statements in which they described the events of that morning and their interactions with Zach. In Kayla's statement, she said the following:

I talked to Zac on the phone Wednesday night & he said he was sick of everybody, everyone was getting on his nerves & he & Rhys Williams were talking about bringing a gun to school & he was very serious about the matter[.] [H]is other option was planting a bomb & taking everyone out on the first (one) shot. But he had made very clear he would spare Katie Spittle because he liked her. This morning I [said]to Sadie LePage I had spoken to Zac & she asked what about & that is when I wrote Sadie telling her about our (mine & Zac's) conversation. Half of the note is now gone.

*Id.*

Sadie said the following in her statement:

I was sitting in first period today and Kayla Hollins wrote me a note that said Zac Durbin was going to bring a gun to school and shoot us all because he was sick of bitchy preps and he was going to start with me because he hated me so much. Then it said that he said it would just be easier to plant a bomb because he could get us all at once. Then in band (second period) I showed Katie Spittle the note because I was scared and she took the note to him at lunch and he said that it was really true,

that he was talking to Rhys and they were seriously thinking about it. Zac hates me so much because I broke up with him 1-2 months ago. And he said he was going to spare Katie of all of this because he likes her.

JA at 152.

And Katie said the following in her statement:

This morning in 2nd period (Band) Sadie LePage showed me the note. At lunch I asked Zac if it was really true, and he said yes. He said him and Rhys were talking about it. He pointed to Sadie and said she's going first. He said he was going to spare me, because he liked me.

JA at 153.

After his meetings with the three girls and after obtaining their statements, Howell contacted Assistant Superintendent James Spisak to inform him of the situation and to begin the emergency removal process with respect to Zach. Spisak agreed that Zach should be removed from the school under § 3313.66 of the Ohio Revised Code because of the "continuing danger" he posed. In an effort to release Zach to an adult, Howell initially tried to reach Zach's mother, Bobbi LaCross, but she was unavailable. He then called Zach's probation officer, Jeffrey Hayes, who came to the school. At roughly the same time, Howell notified Officer Randy LePage and Detective Brian Harbin of the City of Cambridge Police Department about the matter.

When Hayes arrived at the school, Howell briefed him about the situation, told him that the police had been notified and showed him the three girls' written statements. Hayes asked Howell "whether these [girls] were reputable students" because he wanted to determine "whether it was somebody trying to get even with Zach or that type of thing." JA at 509 (Hayes Dep.). Howell confirmed the credibility of the girls'

statements on the basis of their reputations as students. Hayes then called his supervisor, Jean Stevens, the Chief Probation Officer of Guernsey County, alerting her to the alleged threats, the girls' statements supporting them, the girls' reputations with Howell, the credibility of their statements from Howell's perspective, and the possible police investigation. Hayes told Stevens that Rhys was not at school that day and that police were looking for him. He then recommended to her that Zach be removed from the school. Stevens authorized Hayes to remove Zach from the school and to take him into detention at the Guernsey County Juvenile Probation Department.

At this point, Howell removed Zach from study hall and told him about the girls' allegations. In response, Zach confirmed that he knew about the note and acknowledged that Rhys (in his presence) had been "joking around" when talking to Gail Allen about the incident at Columbine, JA at 581 (Howell Dep.), but denied the rest of Howell's accusations, JA at 473 (Durbin Dep.). After the interview, Howell asked Hayes to escort Zach from the school. While Hayes claims that he did not arrest Zach at this point, he acknowledges that Zach was not at liberty to leave and that he handcuffed Zach in conformity with the probation department's policies. Hayes signed Zach out of the school late Friday afternoon and escorted him to the Guernsey County Probation Department in Byesville. Upon arrival, Zach was shackled and handcuffed to a chair. Eventually, Zach was driven to the Jefferson County Juvenile Detention Facility in Steubenville, where he remained over the weekend until he returned to Guernsey County for his Juvenile Court appearance on Monday, April 26th.

### 2. Rhys Williams

Rhys was not involved with the investigation that took place at the school on Friday, April 23rd, because he was not in school that day. Stevens claims that neither she nor Hayes

ordered Rhys's arrest, although she admitted that she authorized his detention in a phone call with a Cambridge police officer. Several Cambridge police officers arrived at Rhys's house on Friday afternoon and informed his mother, Gail Allen, that he had been implicated in a bomb threat. In response, Allen called the probation department. Becky Masters, the probation officer with whom she spoke, confirmed the police officers' report and asked Allen to bring Rhys to the department. Allen brought Rhys to the probation department in Byesville, where Masters and a transportation officer handcuffed and shackled Rhys. He was eventually driven with Zach to Steubenville, held for the weekend and returned to Guernsey County for an appearance in Juvenile Court on Monday, April 26th.

### 3. City of Cambridge Police Officers

Captain Randy LePage and Detective Brian Harbin of the City of Cambridge Police Department received a call from Howell on the afternoon of April 23rd. By the time they arrived at the school, however, Hayes and Zach had already departed. Because Sadie was Captain LePage's daughter, LePage recused himself from any further involvement and Harbin assumed control of the investigation. Harbin collected the written statements that Howell had taken from the three girls, then took a statement from Howell before leaving. He also took more formal statements from each of the girls at the police station later that afternoon. There is no evidence that Harbin ordered Rhys's apprehension, but Harbin was in charge of the investigation when Cambridge Police Officers arrived at Rhys's home.

### C. Monday, April 26th, 1999

On Monday, April 26th, the earliest day they could appear in juvenile court, Zach and Rhys were returned to Guernsey County. At the courthouse, they were separately interviewed by Harbin and later appeared together before Judge

Urbanowicz of the Guernsey County Court of Common Pleas. Rhys and Zach both were placed under house arrest for a few days at the end of the hearing. Zach was also electronically monitored as part of his house arrest. Later that week, Harbin transferred the results of his investigation to Roy Morris, the Guernsey County Juvenile Prosecutor. Morris reviewed the information and charged Zach with making "menacing threats" in violation of Ohio Revised Code § 2903.21. Adhering to the guidelines for Guernsey County juvenile proceedings, Harbin picked up a written statement of the charge from Morris's office, signed it, and filed it with the Clerk's office. Morris declined to file any charges against Rhys because he believed probable cause did not exist that he had committed, or was about to commit, a crime. Zach appeared before Judge Urbanowicz to face trial for the single menacing charge on September 18, 1999 and was acquitted.

## D.   Suspension Issue

Rhys and Zach stayed home from school for a period of time following their appearance in juvenile court. Although their parents allege that Rhys and Zach were suspended, the school disputes the point, claiming it never suspended them. Gail Allen acknowledges that she never received official papers concerning a suspension for Rhys, noting that she kept him home from school in excess of a week because she wanted to shield him from a potential backlash by his peers and because she accepted the advice of the school principal who thought it would be in his best interests as a matter of safety.

Bobbi LaCross alleges that Howell asked Zach to sign a paper concerning his suspension at the courthouse, then told her that he planned to suspend Zach if he was convicted of the aggravated menacing charge. LaCross allegedly asked Howell about the possibility of appealing any suspension, to which he responded that he would mail her the necessary papers. In his brief on appeal, however, Howell states that a

"Notice of Suspension" for Zach was prepared on April 26th in accordance with Ohio Revised Code § 3313.66, but the school never took action on the notice, and it never officially suspended him.

When she did not receive any suspension papers, LaCross allegedly called Superintendent Thomas Lodge to inquire about receiving the papers and about the appeal process. She says that Lodge told her "he had got the suspension papers and there was no recommendation for expulsion." JA at 621 (LaCross Dep.). Lodge, however, claims official suspension papers for Zach did not cross his desk and that he told LaCross that since no suspension was yet filed, "there's nothing to appeal at this point in time." JA at 638 (Lodge Dep.). LaCross persisted and alleges that on May 21, 1999, she was able to obtain the original suspension papers. She attempted to file a written appeal on May 24, 1999, but did not receive a hearing, as the school maintained there was no initial suspension from which she could appeal. Howell and Lodge note that a copy of the "Notice of Suspension" was indeed mailed to LaCross in late May 1999, but that without further action the document alone did not constitute an out-of-school suspension.

## E.   Procedural History

On March 29, 2000, Zach and his mother (Bobbi LaCross) and Rhys and his parents (Gail and David Allen) filed this lawsuit. They asserted a variety of federal-law claims—violation of the boys' First, Fourth and Fourteenth Amendment rights under § 1983, the existence of city and school customs that caused these constitutional violations and the presence of a civil conspiracy to violate these rights. And they asserted a variety of state-law claims—malicious prosecution, false imprisonment, false arrest, defamation and intentional infliction of emotional distress.

On September 20, 2001, all of the defendants filed motions for summary judgment, which the district court granted. First, the court determined that the defendants had probable cause to detain Rhys and Zach and accordingly rejected their Fourth Amendment claims. Second, the court determined that neither Rhys nor Zach was actually suspended from school and accordingly rejected their Fourteenth Amendment claims. Third, the court concluded that Zach and Rhys could not substantiate their conspiracy claim. Fourth, the court rejected the state false arrest and false imprisonment claims because Rhys and Zach could not prove that their detentions were unlawful. Fifth, the court rejected the state law claim of malicious prosecution because Harbin had reasonable suspicion that Zach had engaged in menacing. Finally, the court rejected the other claims because Rhys and Zach had failed to respond to the defendants' summary-judgment motion on them.

On appeal, Rhys and Zach challenge the district court's resolution of their Fourth and Fourteenth Amendment claims. In addition, Rhys appeals his false arrest and false imprisonment claims, and Zach appeals his malicious-prosecution claim.

## II.

The customary rules for reviewing a summary-judgment decision apply. We give de novo review to the district court's decision. *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 490 (6th Cir. 2002). A decision granting summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). And in considering such motions, we give all reasonable factual inferences to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Public officials who perform discretionary functions "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Two questions thus arise in this context: Did the government officials violate a constitutional guarantee? And, if so, did the violation involve a clearly-established constitutional right of which a reasonable officer would have been aware? *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). In the absence of an affirmative answer to both questions, the constitutional tort claims must be dismissed as a matter of law.

### A.   Fourth Amendment Claim

The parties share common ground with respect to the Fourth Amendment's requirements in this area. As a general rule, a law enforcement officer may not seize an individual except after establishing probable cause that the individual has committed, or is about to commit, a crime. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964). Probable cause means the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillipo*, 443 U.S. 31, 37 (1979). Once "probable cause is established," this Court has added,

an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused. In fact, law enforcement "is under no obligation to give any credence to a suspect's story [or alibi] nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause."

*Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999) (citations omitted). At the same time, officers must consider the totality of the evidence "known to them" when considering probable cause, and in cases where they have both inculpatory and exculpatory evidence they must not ignore the exculpatory evidence in order to find probable cause. *Id*. at 372. A "mere suspicion" of criminality will not suffice. *United States v. Harris*, 255 F.3d 288, 292 (6th Cir. 2001).

The rub in this case is whether probation officers Hayes and Stevens—the two primary defendants with respect to this claim—had probable cause to take Zach and Rhys into custody on Friday, April 23, 1999. In the district court's view, the "information conveyed in the girls' written statements was sufficient for the Defendants to have had more than a 'mere suspicion' of Williams' and Durbin's alleged criminal activities." *Williams v. Cambridge Bd. of Educ.*, 186 F. Supp. 2d 808, 816 (S.D. Ohio 2002). In response to this conclusion, plaintiffs argue that because Hayes and Stevens relied on vague statements the girls made to Vice-Principal Howell and did not test the reliability of the statements themselves, they did not have probable cause to detain either of them.

The problem with this argument is that Hayes and Stevens did not merely accept the girls' three statements at face value. After two of the girls spoke to the guidance counselor, Julie Orsini, about the threats, she passed along the information to Vice-Principal Howell and explained that the girls "were visibly shaken up; that—that they were feeling threatened because they had had a correspondence with Zach Durbin concerning threats to them." JA at 576 (Howell Dep.). Howell in turn spoke to all three girls, then asked each of them to write statements about what had happened. The three girls all conveyed the same essential information to Howell, and their written statements matched their oral statements. The contents of the statements were anything but "kids will be kids" material. According to Sadie LePage: (1) "Zac

Durbin was going to bring a gun to school and shoot us all because he was sick of bitchy preps"; (2) "he said it would just be easier to plant a bomb because he could get us all at once"; and (3) "[Zach] was talking to Rhys and they were seriously thinking about it." According to Kayla Hollins: (1) "I talked to Zac on the phone Wednesday night & he said he was sick of everybody, everyone was getting on his nerves & he & Rhys Williams were talking about bringing a gun to school"; and (2) "he was very serious about the matter [;] his other option was planting a bomb & taking everyone out on the first (one) shot." According to Katie Spittle: (1) "At lunch I asked Zac if [the note] was really true, and he said yes. He said him and Rhys were talking about it"; and (2) "[h]e pointed to Sadie, and said she's going first."

Only after Howell vouched for the girls' credibility, and indeed only after Hayes queried whether the girls could be trusted, did Hayes credit this version of the events. In view of Howell's position as Vice-Principal, Hayes was justified in trusting Howell's assessment of the three girls' credibility and in respecting Howell's superior position for doing so. On top of this information, Howell separately met with Zach, who confirmed that he knew about the original note, but denied the remainder of Howell's accusations, contending that Rhys (in his presence) had been "joking around" when they discussed the Columbine incident with Gail Allen.

On this record, the officers' investigation sufficed for the task at hand. The question is not whether Zach made these threats but whether the defendants had probable cause to believe that he had made them. In the aftermath of Columbine, the corroborated statements of three girls whom Vice-Principal Howell deemed trustworthy permissibly cemented the probation officers' probable cause determination—regardless of whether the concern was a shooting/bomb threat or criminal menacing and regardless of whether the suspect himself denied making those threats. At a minimum, the acknowledged statements established

probable cause of aggravated menacing, particularly in the environment of that sobering week. *See* Ohio Rev. Code Ann. § 2903.21 ("No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of another person . . . . Whoever violates this section is guilty of aggravated menacing."); *see also Cohen v. Dubuc*, No. 3:99-CV-2566(EBB), 2000 WL 1838351, at *4 (D. Conn. Nov. 28, 2000) (police officer had probable cause to arrest a high school student after three independent witnesses gave statements that, two days after the Columbine tragedy, they heard the student make threatening comments about "shooting up" the school).

Separately, Rhys Williams and his parents argue that the second-hand references to him in the girls' statements did not establish probable cause for *his* arrest. "A close review of the girls' statements," they argue, "reveals that these students made no claim that they had seen or heard [him] do anything . . . [and] only reported that [Zach] told them he had 'spoken to Rhys about it.'" Williams Br. at 33. They also claim that Kayla's conduct—first reciting her story in a note to a friend two days after her initial conversation with Zach, then trying to tear up the note, then becoming afraid when her story began to spread—shows she exaggerated her accusations.

The evidence, however, cannot be so readily parsed. While we acknowledge that it is easier to dispense with Zach Durbin's claim than it is to resolve Rhys's claim as a matter of law, the girls' statements confirm that Rhys was indeed connected to the matter. Just as importantly, Zach himself confirmed to Vice-Principal Howell that he *and* Rhys were involved in all of the relevant conduct—whether one labels the conduct a plan of violence, a threat of violence or an immature (but menacing) joke gone awry. Having concluded that probable cause existed for the one boy that Friday afternoon, it was reasonable as a matter of law for the probation officers to conclude that it existed for the other. That Rhys was not eventually charged with menacing does

not change matters. An arrest grounded in probable cause does not become invalid merely because the State chooses not to prosecute the individual or a jury opts for acquittal. *See Criss v. City of Kent*, 867 F.2d 259, 262 & n.1 (6th Cir. 1988).

**B. Fourteenth Amendment Claim**

Plaintiffs separately argue that the school officials violated their due-process rights in suspending them without notice and a hearing. We disagree.

While the Due Process Clause applies to children and to public schools, the Supreme Court has long made clear that the procedural requirements of the Clause have considerably less force when applied to discipline meted out by school officials to students under their care. Unlike juvenile criminal proceedings, for example, hearings in connection with short school suspensions need not "afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." *Goss v. Lopez*, 419 U.S. 565, 583 (1975). Imposing such formalities on a school suspension proceeding would "not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process." *Id.* Before suspending a student for ten days or less, as a result, all that a school official must do is give (1) adequate notice of the charge against the student, (2) an explanation of the evidence supporting the charge and (3) an opportunity for the student to respond. *See id.* at 581; *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 706 (7th Cir. 2002) ("[U]nder *Goss* students have a right to only minimal process."); *Donovan v. Ritchie*, 68 F.3d 14, 17–18 (1st Cir. 1995) (applying these requirements to a temporary school suspension that also barred participation in athletics and school activities, yet noting that under *Goss*, "the mere fact other sanctions are added to a short suspension does not trigger a requirement for

a more formal set of procedures"); *C.B. ex rel. Breeding v. Driscoll*, 82 F.3d 383, 386–87 (11th Cir. 1996) (noting that, in the short school-suspension context, "the process provided need consist only of 'oral or written notice of the charges against [the student] and, if he denies them, an explanation of the evidence the authorities have and an opportunity [for the student] to present his side of the story'") (quoting *Goss*, 419 U.S. at 582); *Signet Constr. Corp. v. Borg*, 775 F.2d 486, 490 (2d Cir. 1985) (citing *Goss* for the proposition that "[s]ituations may occur where, given the burden a normal proceeding would impose, the nature of the interests at stake, the time limit for state action, and other circumstances, an informal non-judicial hearing will suffice").

Measured by these requirements, each plaintiff's claim fails as a matter of law—first because neither boy was in fact suspended and second because, with respect to Zach, even if he had been suspended, the process given him was all the process that was due. We consider each claim in turn.

### 1. Rhys Williams

In the district court's view, Rhys Williams and his parents could not challenge the validity of the procedures used to impose a suspension on Rhys because the school never suspended him. We agree.

Rhys and his parents claim that he "was kept out of school for a period of several days" following his court appearance. Williams Br. at 24. And they observe that Vice-Principal Howell wrote a memo on April 23, 1999 indicating that "suspension papers for Zach and Rhys" had been prepared. *Id.* at 42. At the same time, however, they concede that "it appears that the suspension was never signed or filed." *Id*. at 24. And, most pertinently, Rhys's mother acknowledged in her deposition that Rhys in fact was not suspended.

Q.  He was allowed to go to school that entire week, correct? He was not under suspension? From April 26 on, he was not under suspension, was he?

A.  No, he was not under suspension.

Q.  So he just chose not to go to school that week?

A.  I guess a lot of us chose that he did not go that week.

Q.  How come?

A.  I called the principal and asked about the work he's going to miss and whether to—I told her I was going to leave him out of school for a few days, this and that, and she said she's not telling him not to come to school, but she would advise or suggest it would be a good thing that he didn't for the safety.

JA at 437 (Allen Dep.).

On this record, the district court correctly rejected this due process claim as a matter of law. Rhys's mother acknowledged that her son was not suspended by the school district and that the decision to keep him home was hers, not the principal's. Even if this decision came with the principal's support, that fact does not lay the necessary predicate for this claim—that the school district in fact imposed a suspension.

### 2. Zach Durbin

The district court likewise rejected Zach Durbin's due process claim on the ground that the school merely initiated a formal suspension procedure against Zach but never followed through on it. We again agree, and add that, even if Zach did receive an informal suspension, he received all of the process to which *Goss* entitles him.

According to Zach's mother (Bobbi LaCross), on Monday, April 26th, Howell told her "Zach was going to be suspended; but if he was found not guilty [of the aggravated menacing charge], then the suspension would be canceled." JA at 617 (LaCross Dep.). LaCross interpreted this statement to mean that the school had imposed a ten-day suspension on Zach, which was "to be served immediately." Durbin Br. at 15. There is little doubt that at this point suspension papers were prepared, Howell asked Zach to sign them, and it is fair to infer from the record that Howell at least expected that a formal suspension would be issued.

At some point after this initial conversation between Howell and LaCross, she asked Superintendent Lodge for the suspension paperwork so that she could file an appeal of the suspension, as authorized by Ohio law. *See* Ohio Rev. Code Ann. § 3313.66(D)–(E). Consistent with Howell's previous statement to LaCross regarding the status of Zach's suspension, Lodge told her "there's nothing to appeal at this point in time." JA at 638 (Lodge Dep.).

The school eventually gave LaCross the prepared suspension papers—though well after Zach had already returned to school and not because the school actually followed through on the suspension, but because LaCross asked to see the proposed papers. Because Zach was found not guilty of the criminal charge of aggravated menacing in September 1999, no suspension was ever issued (and none appears on his record), no formal papers were served on Zach and his family, and no formal suspension procedures were followed.

While the school district's suspension policy stipulates that adequate notice and an opportunity for an informal hearing be given to a student before a suspension is issued, *see* Ohio Rev. Code Ann. § 3313.66(A), it nowhere stipulates when and how school administrators are to suspend students. Nor does it prohibit conditioning a suspension on whether a

student is criminally convicted of a charge. *See generally* Ohio Rev. Code Ann. § 3313.66. Had Zach been found guilty of aggravated menacing, there is no reason to believe his "Notice of Suspension" would not have crossed Lodge's desk, setting the official school-district suspension process on its proper course. On this record, we agree with the district court that the school never issued the suspension, even if it did initiate the suspension process, and accordingly this due-process claim should be dismissed.

But even if one assumes that the record creates a fact dispute about whether Zach received an informal suspension, his procedural due-process rights were not violated. "[I]n connection with a suspension of ten days or less," *Goss* requires only "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence that authorities have and an opportunity to present his side of the story." 419 U.S. at 581. The decision also provides that "[t]here need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Id*. at 582. Here, after taking written statements from the three girls, Howell called Zach to his office for questioning. He informed Zach of the allegations against him and asked Zach for an explanation. No doubt, there was little delay, if any, between the notice Zach received and his chance to respond, but under *Goss* that was all that was required. *See* 419 U.S. at 582; *Kaelin v. Grubbs*, 682 F.2d 595, 602 n.9 (6th Cir. 1982).

Nor was there a violation of Zach's right to a hearing. Again, *Goss* points the way. It explains that the student must "be[] given an opportunity to explain his version of the facts at this discussion," and the student should "be told what he is accused of doing and what the basis of the accusation is." 419 U.S. at 582. As this Court has observed, "'informal give-and-take between student and disciplinarian' will satisfy the

procedural due process requirements for a suspension lasting for ten days or less." *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1359 (6th Cir. 1996) (quoting *Goss*, 419 U.S. at 584). Once Howell informed him of the allegations, Zach was given a chance to respond. He explained the nature of his conversation with Rhys and Gail Allen on April 23rd, admitted that Rhys (in Zach's presence) had been "joking around" about Columbine, and admitted that he knew about Kayla's note. After this conversation, Zach may well have believed that the information before Howell did not suffice to suspect him of trying to bomb the school or shoot its students. But he cannot claim that he was denied the kind of "informal give-and-take between student and disciplinarian" that *Goss* requires for a ten-day suspension from school. *Goss*, 419 U.S. at 584.

Zach's argument that his due-process rights were violated because he did not receive written notice, *see* Ohio Rev. Code Ann. § 3313.66(A)(1), and LaCross's argument that she did not receive written notice within one day of the supposed suspension, *see* Ohio Rev. Code Ann. § 3313.66(D), are unavailing. While they may be relevant state-law claims, they do not affect our interpretation of the Fourteenth Amendment because the liberty interest to which Zach's due-process rights attach is his interest in his continued education, not his interest in written notice. *See Martin*, 295 F.3d at 706 (noting that in the context of a school suspension that allegedly did not conform to provisions of state law, "failure to conform with the procedural requirements guaranteed by state law does not by itself constitute a violation of federal due process" and that *Goss* has established the minimal due process required in the context of a short-term suspension); *Purisch v. Tenn. Tech. Univ.*, 76 F.3d 1414, 1423 (6th Cir. 1996) (noting that in the context of an allegedly unfair tenure review, "[v]iolation of a state's formal procedure [] does not in and of itself implicate constitutional due process concerns. . . . [T]he issue . . . is not whether [school administrators] conformed [with the school's] . . . grievance procedure in

reviewing the tenure decision. Rather, the issue is whether Purisch was afforded the process due to protect his property right to a fair tenure review process"); *Pro-Eco, Inc. v. Bd. of Comm'rs*, 57 F.3d 505, 514 (7th Cir. 1995) ("Section 1983 affords relief only if the Constitution is offended, and a violation of a state procedural statute does not offend it.").

In the end, *Goss* establishes the minimal procedural requirements necessary to protect a student in the context of a short-term school suspension. The notice Howell gave Zach was satisfactory under *Goss* because Howell, as the relevant disciplinarian, discussed the alleged misconduct with Zach, who was given a chance to respond. Though expeditious and assuredly informal in nature, Zach received the rudimentary process required by *Goss* when the suspension is ten days or less. Suspended or not, in other words, Zach's Fourteenth Amendment due-process rights were not violated.

## C. State Law Claims

Rhys and Zach also appeal their state law claims. Rhys appeals his false arrest and false imprisonment claims, saying simply that they "rise or fall entirely on the issue of probable cause. For that reason, the facts and analysis . . . regarding [his] . . . Fourth Amendment claims apply equally to these claims under Ohio law." Williams Br. at 43.

As to the false arrest claim, Hayes and Stevens, as employees of a political subdivision performing a governmental function, are immune from tort liability unless Rhys can show their "(a) . . . acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) [their] acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or] (c) [c]ivil liability is expressly imposed upon [them] by a section of the Revised Code." Ohio Rev. Code Ann. § 2744.03(A)(6)(a)–(c). Rhys has not provided any evidence that these defendants acted with malice, bad

faith or in a wanton or reckless manner. And because we have already concluded that Hayes and Stevens had probable cause to arrest and detain Rhys and Zach, the probation officers' actions were within the scope of their employment and in good faith.

As to the false imprisonment claim, Rhys must show Hayes and Stevens confined him intentionally without lawful privilege and against his consent in a limited area for a nontrivial period of time. *See Feliciano v. Krieger*, 362 N.E.2d 646, 647 (Ohio 1977); *see also Witcher v. City of Fairlawn*, 680 N.E.2d 713, 715 (Ohio Ct. App. 1996). The detention must be "purely a matter between private parties for a private end" in which there is no intention of bringing an individual before a court. *Rogers v. Barbera*, 164 N.E.2d 162, 164 (Ohio 1960). Hayes and Stevens did not falsely imprison Rhys because they confined him in accordance with Ohio law.

Zach also appeals his malicious prosecution claim. To prevail, he must establish "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause and (3) termination of the prosecution in favor of the accused." *Trussell v. Gen. Motors Corp.*, 559 N.E.2d 732, 735 (Ohio 1990). Officer Harbin is the only defendant who instituted a prosecution in this case—charging Zach with aggravated menacing, which requires proof that one knowingly caused another to believe the offender would cause serious harm. Ohio Rev. Code Ann. § 2903.21. Zach acknowledges that Harbin's complaint against him "included these elements and further alleged that Zachary threatened the life of Sadie LePage, as well as the lives of other students, with a gun or a bomb." Durbin & LaCross Br. at 28. Though the prosecution ultimately terminated in Zach's favor, Zach has failed to allege any facts that demonstrate Harbin acted with malice toward him in commencing this prosecution.

## III.

For the foregoing reasons, the district court's decision is affirmed.

---

## DISSENTING IN PART, CONCURRING IN PART

---

KAREN NELSON MOORE, Circuit Judge, dissenting in part, concurring in part. I respectfully dissent from Parts II.A and II.B of the majority's opinion. The tragic destruction at Columbine High School in Littleton, Colorado etched devastating images of adolescent rage run amok onto the national consciousness. The realization that the perpetrators of this violence were young teenagers crystallized latent fears that a new danger had emerged from within our own communities. In the weeks of national introspection that followed, parents, students, and educators alike expressed anxiety that copycat incidents were imminent and stood vigilant against their occurrence. While I do not discount the reality that such an environment left these school and law enforcement officials with little choice but to make unenviable judgments under enormous pressure,[1] I cannot conclude that post-Columbine trepidation over copycat crimes systematically discounts real factual disputes over the violations of these students' constitutional rights.[2] Rhys and

---

[1] In fact, the Columbine school district, the Jefferson County Sheriff's Department, and the parents of the two Columbine killers have all been sued for their *failure* to act upon real and credible threats. *See Castaldo v. Stone*, 192 F. Supp. 2d 1124 (D. Colo. 2001). The existence of such cases should not, however, deprive students of legal redress for constitutional infractions by schools, police, and other local officials.

[2] At least one other federal court vindicated the efforts of police officers following a threat in the wake of the Columbine tragedy in a case that is distinguishable on the facts and obviously not binding on this panel. *See Cohen v. Dubuc*, No. 3:99-CV-2566 (EBB), 2000 WL 1838351, at *4-6 (D. Conn. Nov. 28, 2000) (the arresting officers themselves interviewed the witnesses, revealing an actual date of attack, and the threats were more coherent and violent).

Zach have presented several genuine issues of material fact concerning the circumstances of their arrests and suspensions, which would permit a reasonable jury to find in their favor. At this stage of the litigation, we are charged only with the task of assessing whether such a quantum of evidence has been proffered and not with the responsibility to balance such evidence against facts to the contrary. As a result, I would hold that the grant of summary judgment was improper with respect to Rhys's and Zach's § 1983 Fourth Amendment claims against Jeffrey Hayes ("Hayes") and Jean Stevens ("Stevens") and their § 1983 Fourteenth Amendment claims against William Howell ("Howell") and Thomas Lodge ("Lodge").[3]

---

[3] I concur with the majority's holding to the extent that it affirms the district court's grant of summary judgment as to several other claims asserted by Rhys and Zach. First, neither plaintiff appealed the grant of summary judgment with regards to the following claims: intentional infliction of emotional distress, defamation, violation of First Amendment rights in contravention of § 1983, conspiracy to violate § 1983, and the existence and enforcement of school and city policies that proximately caused the violation of constitutional rights. Notably, neither plaintiff argued on appeal that an officially executed or tolerated custom or policy directly led to and was proximately linked with unconstitutional behavior. *See Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993), *cert. denied*, 510 U.S. 1177 (1994). Thus, the plaintiffs are not appealing the central claims against the institutional defendants. Litigants waive any claims or defenses that they do not raise in their appellate briefs. *Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 153 (6th Cir. 1996).

Second, Rhys's and Zach's § 1983 Fourth Amendment claims against the school official and police department defendants fail as a matter of law because those defendants never "arrested" Rhys or Zach. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). No police officers were present at the school when Zach was arrested. Additionally, although Zach was literally "detained" by the school officials, none of the school official defendants arrested or seized Zach such that they violated his Fourth Amendment rights. *See Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1013 (7th Cir. 1995) ("Once under the control of the school, students'

## I. BACKGROUND FACTS

I explicate my understanding of the facts because part of my disagreement with the majority stems from our somewhat divergent interpretations of the record, particularly the facts surrounding Zach's arrest. After the phone call on Wednesday, April 21, 1999, during which Zach allegedly told Kayla Hollins about his plan to kill the "preps" and implicated Rhys in the process, Kayla made no mention of the phone call to her parents, to her friends, or to school authorities for nearly two days. Kayla first discussed the alleged contents of the phone call in a note written to Sadie Le Page on Friday, April 23, 1999. A few hours and several class periods later, the girls approached Zach and asked him whether the note's contents were true, allegedly receiving an affirmative answer. Zach disputes that he confirmed the note's veracity, and before he had a chance to read the note, Kayla ripped the note in two, allegedly because she did not want Zach to read the note and because she did not want him to get in trouble. In her testimony at Zach's trial, she intimated that the note and the following drama were jokes, and that she did not expect or want Zach to get arrested. Other facts bolster the conclusion that Kayla may have fabricated or embellished her conversation with Zach; Kayla was reported to exaggerate at times and had caused trouble for

---

movement and location are subject to the ordering and direction of teachers and administrators."). Furthermore, with regards to Rhys's arrest, summary judgment was appropriate for all the defendants, except for defendant Stevens, as only Stevens was involved in Rhys's arrest.

Third, the district court properly granted summary judgment on Rhys's and Zach's § 1983 Fourteenth Amendment claims against the Probation Department defendants (Hayes, Stevens) and the Cambridge Police Department defendants (LePage, Harbin, City of Cambridge) because they have no authority over suspensions in the Cambridge schools.

Fourth, I concur fully with the majority's discussion of the state-law claims.

others in the past by prevaricating. It was only after the lunch period that Sadie and Katie finally decided to inform school officials of the threat, approaching the school's guidance counselor, Julie Orsini, who in turn contacted Vice-Principal William Howell.

Howell then took the lead role in "investigating" the incident. He met with Sadie and Katie before eventually calling Kayla to his office. All three girls wrote statements in which they described the events of that morning and their interactions with Zach. Howell did not investigate the veracity of their claims; he instead assumed that the girls were telling the truth. He never saw the note that Kayla had written. At some point after he spoke with the girls, Howell began the process of "emergency removing" Zach from the school, Howell contacted Assistant Superintendent James Spisak ("Spisak"), who agreed that Zach needed to be transferred out of the school because of a "continuing danger" that Zach posed. *See* Ohio Rev. Code § 3313.66(C).

After failing to reach Zach's mother, Howell called Hayes, Zach's probation officer, so that Howell could release Zach to an adult. Hayes and Howell spoke twice before Hayes arrived at the school, and during the second phone call, Howell informed Hayes of the girls' claims that Zach had threatened them with violence. Either before going to the school or while in transit, Hayes spoke with Stevens, his supervisor and the Chief Probation Officer of Guernsey County, and erroneously informed her that two of their juvenile probation "clients" were implicated in a bomb threat. Hayes mentioned that the Cambridge police had begun an investigation, but Hayes did not name any officers, and he later testified that he did not see any police officers when he arrived at the school.

Upon arrival, Hayes met with Howell, who informed Hayes about the statements of the three girls. Hayes asked Howell "whether these [girls] were reputable students," because he wanted to determine "whether it was somebody trying to get

even with Zach or that type of thing." Hayes Dep. at 21.[4] However, Hayes never spoke with girls; he did not assess the girls' credibility himself, nor did he conduct an in-depth investigation. Hayes testified that his decision to seize Zach was based on the girls' written statements, Howell's understanding of the contents of Kayla's torn note, Howell's intuitions about Zach, and Hayes's belief, shaped primarily by Howell, that the girls were reputable sources. However, Hayes did not learn that Kayla had a reputation, even among her friends, for embellishment of the truth, nor did he learn that Kalya had disciplinary problems in the past.

The details of Zach's arrest are critical. There are several nontrivial disputes concerning the few minutes preceding Zach's arrest, the significance of which plays no small role in my decision to dissent. Howell called Zach into his office and questioned him about the girls' accusations. Howell stated: "When questioning Zach in the office, he had indicated that he was joking around and the statement was, You know how Rhys is." Joint Appendix ("J.A.") at 581 (Howell Dep.). Howell also testified that Zach confirmed the contents of the note, although Howell gave contradictory testimony about whether he ever saw the note or showed it to Zach. *Compare* J.A. at 594 (Howell Dep.) *with* J.A. at 296 (Zach Durbin Trial, Howell Test.) ("[T]hey [the girls] stated that Zach had written a note but I never was able to resurface the note.").

For his part, Zach disclaimed that he had made any threats. Zach stated in his deposition that *Rhys* had been "joking around" with his mother, Gail Allen, when Rhys and Zach were discussing the Columbine incident with Allen several hours before Zach and Kayla's telephone call. J.A. at 469-70.

---

[4]Hayes was deposed on May 3, 2001. His deposition does not appear in the Joint Appendix, but a copy of the deposition is a part of the official district court record.

The "joking around" consisted of Rhys asking his mother what she would do if he and Zach perpetrated an act like the tragedy that befell Columbine, but it did not include any indication that Zach or Rhys intended to harm anyone. Zach stated that *he* did not "joke around" with Rhys's mother. The majority believes that Zach informed Howell about Rhys's "joking around." However, Zach's deposition does not indicate that he told Howell that either he or Rhys had been joking around with Rhys's mother. His deposition testimony about his discussion with Howell is as follows:

Q:  Tell me what happened when you got to the office.

A:  We went in Mr. Howell's office, and he closed the door, and Mr. Howell told me that there had been a note circulating and three girls came to the office with the note and told him that I was — me and Rhys said we was going to blow up the school.

Q:  Do you know what he was talking about when he said that?

A:  I knew what he was talking about after he said a note was circulating.

Q:  You knew what three girls he was talking about?

A:  Yeah.

Q:  What did you say to that?

A:  He just kept going on with the story and then — *I was like, no, that's not true.* And then he just kept going on and then he asked me, he said, do you have anything to say, and then I started telling him what really happened about me being at Rhys's house and then my conversation with Kayla, and then that's

when Jeff [Hayes] was like, "I've heard enough. Set down your books."

J.A. at 473-74 (Durbin Dep.) (emphasis added). Zach stated clearly in his deposition that he never told Howell that he had joked with Kayla about "doing something like the kids did at Columbine." J.A. at 474.

During a second phone call with Stevens before Hayes entered Howell's office, Hayes reported that he had taken statements from three girls whom he found to be reputable, prompting Stevens to approve Zach's "arrest." At some point, Hayes went into Howell's office, but it is not clear at what point during Howell's questioning of Zach this occurred. It is also uncertain whether Hayes, as the actual arresting officer, actually heard Zach admit that he had made the threats, if Zach ever said such a thing. Hayes did not corroborate Howell's assertion that Zach admitted to making the threats. Furthermore, Hayes never asked Zach to recount his view of the day's events. Hayes later stated: "I'm not the one that's going to be investigating. I didn't want him to say anything to me. I never want the kid to say anything to me that, you know, I might have to testify against him or something like that. He did profess his innocence to me." Hayes Dep. at 35-36. After some undefined but brief period of time, during which Zach tried to exculpate himself, Hayes told Zach to set down his books, and then Hayes arrested Zach.

Rhys was not involved with any aspect of the investigation that took place at the school on Friday, April 23, as he was absent from school. Neither Hayes nor Stevens observed Rhys or spoke with the girls about Rhys. Rhys's name became entwined in these events only because of Kayla's note, as neither Howell nor Zach recalled that Rhys's name came up in the conversation in Howell's office.

## II. RHYS'S AND ZACH'S § 1983 CLAIMS

Rhys and Zach assert two separate § 1983 claims based upon alleged violations of their Fourth and Fourteenth Amendment rights. I believe that the genuine issues of material fact attendant to both claims require the reversal of the district court's grant of summary judgment.

### A. The Fourth Amendment Claims

Recognizing that all evidence and inferences from that evidence must be taken in a light most favorable to Rhys and Zach, I believe that it is patently clear that there is a genuine issue of material fact concerning whether or not Hayes and Stevens had probable cause to arrest them.[5] Probable cause means the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). "The Fourth Amendment . . . necessitates an inquiry into probabilities, not certainty." *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998). In analyzing an officer's actions, we must look at the totality of the circumstances from a reasonable officer's

---

[5]Zach can assert a § 1983 Fourth Amendment claim against both Hayes and Stevens, under theories of direct and supervisory liability, whereas Rhys can pursue his § 1983 Fourth Amendment claim only against Stevens based upon supervisory liability. Hayes arrested Zach and another probation officer, Becky Masters, arrested Rhys; Stevens ordered the arrest of both in her capacity as the supervisor of both probation officers. The supervisor of a violating party may be liable for that party's violation of a third person's constitutional rights, if the supervisor "encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). It is not disputed that Stevens "at least implicitly authorized, approved or knowingly acquiesced" in the detention of both students. *Id.*

perspective at the time of the arrest so as to avoid the effect of hindsight bias. *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001). The arresting officer does not need to demonstrate that prima facie proof exists before arresting a suspect, but the officer's underlying motivation for the arrest must be based on something more than mere suspicion. *See United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990).

Even though an officer does not have to search for balancing evidence after establishing that probable cause existed, an officer must consider all evidence, including exculpatory evidence, before making a probable cause determination. Officers cannot make "hasty, unsubstantiated arrests with impunity." *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999). Nor can they "simply turn a blind eye towards potentially exculpatory evidence known to them." *Id.* at 372. Furthermore, there can be no probable cause for an arrest when it is based upon an officer's reliance on vague information from a source of untested reliability. *Wong Sun v. United States*, 371 U.S. 471, 482 (1963). In general, the question of probable cause is one for the jury, unless it is clear that only one reasonable determination is possible. *Crockett v. Cumberland College*, 316 F.3d 571, 581 (6th Cir. 2003).

### 1. Rhys's § 1983 Fourth Amendment Claim Against Stevens

Considering all available evidence and inferences from that evidence in the light most favorable to Rhys, a reasonable jury could conclude that the facts and circumstances of which Stevens was aware did not justify Rhys's arrest because Stevens relied blindly upon Hayes's recommendations, without confirming that Hayes had tested the allegations of the three students, investigated the incident beyond accepting Howell's version of the events, or even spoken with Rhys. *Compare Criss*, 867 F.2d at 262; *Ahlers*, 188 F.3d at 372. When Hayes called Stevens, Rhys was not at school, and Hayes's knowledge of Rhys's potential involvement came

only thirdhand (Hayes spoke with Howell about Kayla's note, which recounted the alleged conversation with Zach from the night before, during which Rhys's name was briefly mentioned). Hayes did nothing further to investigate Rhys's involvement, nor did Stevens order him to do so. Hayes did not speak to the girls, nor did he confirm Rhys's involvement in the threat. While the girls did believe that Zach had personally indicated the veracity of his threat, no comparable evidence existed as to Rhys. The only evidence linking Rhys to the threat was Kayla's note, which Hayes never saw, and Kayla's statements, which Hayes never took. Both of these were tangential pieces of evidence, as Kayla never actually spoke with Rhys, a fact that Hayes never uncovered.

One could conclude that it was impossible for Stevens to believe that probable cause existed based upon the extremely limited evidence gathered by Hayes, who had neglected to speak with or observe the accused, to test the allegations of the principal witnesses, or to investigate Rhys's involvement more than superficially. Hayes relied on hearsay information about a student who was not even in attendance in school and whose name became intertwined in this web of events only because of Kayla's note. Hayes then relayed this data to Stevens. From that limited information, Stevens authorized a detention. As the Supreme Court has said, there can be no probable cause for an arrest where it is based upon an officer's reliance on vague information from a source of *untested* reliability. *Wong Sun*, 371 U.S. at 482. Consequently, I believe that there is a genuine issue of material fact concerning whether Stevens had probable cause to order the arrest of Rhys.

### 2. Zach's § 1983/Fourth Amendment Claim Against Hayes and Stevens

The circumstances surrounding Zach's arrest undoubtedly present a closer call, but ultimately I believe that the district

court's grant of summary judgment was in error.[6]  Much of the same rationale that supports my reasoning regarding Rhys's claim against Stevens applies here.  Hayes arrived at the school mistakenly believing that the school was handling an impending bomb threat, a misunderstanding that he conveyed to Stevens.  Relying solely on Howell's own limited investigation and Howell's belief that the girls were "reputable and believable," Hayes performed no additional investigation, foregoing an opportunity to assess for himself the girls' credibility and to discover that at least one of the girls had a reputation for exaggeration.

A sharp difference between Zach's and Rhys's arrests is that Hayes did actually speak with Zach.  Hayes had an opportunity to assess Zach's behavior and his credibility, but Hayes declined to hear Zach's recounting of events, mainly out of a belief that this would protect Zach.  This deprived Hayes of the ability to make a grounded determination that he had probable cause to arrest Zach.  I do not endorse a wholesale rule that law enforcement officials investigating a crime or a threat of a crime must always speak with the alleged perpetrator before determining that probable cause exists, particularly when sufficient inculpatory evidence is apparent to the arresting officer.  *See Klein v. Long*, 275 F.3d 544, 551 (6th Cir. 2001) (holding that officers had probable cause to arrest without questioning the suspect when officers responded to a domestic violence 911 call and immediately saw a visibly upset and bleeding woman who told the officers that her husband had physically harmed her).  Nonetheless, when sufficient inculpatory evidence is not immediately obvious, an arresting officer has done little to investigate the threats allegedly made by the accused, and the officer has not spoken with the principal accusers, the determination of probable cause is undermined.

---

[6]For simplicity's sake, Stevens and Hayes are grouped together in this discussion, because both are liable for Hayes's actions.

While Howell testified that Zach admitted making threats against Kayla, but that Zach was only "joking around" in making such intimidations, Zach denies ever having made such threats.  The existence of this factual dispute highlights two problems with the majority's holding.  First, Zach disputes that he ever admitted threatening Kayla.  Zach told Howell that in his conversation with Kayla he merely recounted the details of an innocuous conversation with Rhys's mother.  In his deposition, Zach declared that he did not confirm the veracity of the ripped note's contents to Howell.  It is not for this court to decide whether Zach or Howell is more believable; rather, we must assume that Zach's story is true for the purposes of reviewing the district court's grant of summary judgment. Second, even if Zach did make such an admission, there is no evidence that Hayes heard it, and thus it could not have informed his probable cause determination.  As the arresting officer, it is Hayes's probable cause calculus, and not Howell's, with which we should be concerned.  The majority appears to focus on Howell's determination of the trustworthiness of the three girls, but it is Hayes's probable cause determination, not Howell's, that is the focus of this case.  Neither Howell nor Hayes suggest that Zach admitted to having made the threats in Hayes's presence or that Howell told Hayes about the supposed "confession" before Hayes decided to arrest Zach.

There is no doubt that Hayes was faced with a difficult and delicate choice.  He arrived at the school and was told by Vice-Principal Howell that Zach, who had a history of prior, albeit nonviolent, juvenile delinquency, had threatened several students two days after the Columbine disaster.  However, Hayes, as a probation officer, had little experience in investigating crimes or potential crimes.  *See* Hayes Dep. at 25 ("We don't normally investigate things.  We are asked to act on an emergency basis . . . .  That's why I wanted to see what these statements said, to see if it was, you know, possibly believable, and then we would call on law enforcement to investigate it . . . ."); *see also United States v.*

*Guzman*, 75 F.3d 1090, 1096 (6th Cir.), *cert. denied*, 519 U.S. 906 (1996) ("Law enforcement officers naturally reach conclusions based on their training and experience."). He did not ask Howell to describe in more depth the chain of events that led to Zach's emergency removal. He did not inquire of Howell about the bases for Howell's determination that the girls were telling the truth. He did not interview *any* of the students involved, either the girls or Zach, to make his own assessment of their reliability. He did not investigate whether Zach even had access to weapons that would allow him to carry through the alleged threat. Hayes did not make another attempt to contact Zach's parents or to keep Zach at the school until his parents could be reached, despite the fact that there was no suggestion that Zach would have engaged in any violence waiting for his parents at the school. This was not a situation in which Howell or another member of his staff observed Zach make a threat or commit any act of violence or in which multiple warning signs about Zach's behavior and history made his alleged threat more likely. By analogy, it would surprise the reasonable person if the police could have probable cause to arrest him or her based solely upon hearsay, where no observable evidence supported an allegation of wrongdoing and the police failed to question either the accuser or the accused, but instead relied on the statement of a third party to whom the accuser recounted the hearsay.

Our decision in *Williams v. Ellington*, 936 F.2d 881 (6th Cir. 1991), provides some contrast about the level of investigation that must take place before school officials can act, although the legal question in *Williams* concerned probable cause to search as opposed to probable cause to arrest. *See New Jersey v. T.L.O.*, 469 U.S. 325, 341-42 (1985) (establishing that a student search "does not require strict adherence to the requirement that searches be based on probable cause" and stating that a search will satisfy a "reasonableness" requirement "when there are reasonable grounds for suspecting that the search will turn up evidence" of an illegality). In *Williams,* the plaintiff, a teenage girl,

claimed that her high school violated her Fourth Amendment rights by strip searching her without probable cause as part of an investigation into allegations that she had been consuming drugs at the school. *Id.* at 882. A fellow student first alerted the principal to the problem by claiming that she had witnessed the plaintiff and a friend ingesting drugs in class. The principal verified that the accusing student had no animosity towards the plaintiff, ruling out any ulterior motives of the accuser, and then launched a *multiday* investigation of the plaintiff. He approached several of the plaintiff's teachers, who corroborated her strange behavior and reported a note that the plaintiff wrote in which she referred to drug use. The principal also collected information from the school's guidance counselor, the plaintiff's aunt, and the friend's father, all of whom expressed concern that both students may have been taking drugs. The principal acted only when the student who first made the allegation again approached him and complained for the second time that the plaintiff was ingesting drugs in class. *Id.* at 883.

We held that reasonable suspicion — the standard set forth in *New Jersey v. T.L.O.* — did exist for the strip search in *Williams*. Based upon *T.L.O.*'s analogy to the reasonable-suspicion standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968), we wrote, "We can correlate the allegations of a student, implicating a fellow student in unlawful activity, to the case of an informant's tip," which by itself meets the threshold for reasonable suspicion. *Williams*, 936 F.2d at 888. Yet, when "there is concern that students will be motivated by malice and falsely implicate other students in wrongdoing, that type of situation would be analogous to [an] anonymous tip," which does not establish reasonable suspicion in the absence of further investigation. *Id.* at 888-89. We upheld the lower court's dismissal of the plaintiff's suit in *Williams* because in addition to the complaining student's "tip," which the principal determined was not borne of malice, the principal uncovered strong evidence during his

ensuing investigation, including the suspicions of the plaintiff's family that she was using drugs.

Juxtaposing the events in *Williams* with the facts of this case demonstrates the insufficiency of the investigation of Zach's threat. Both Howell and Hayes satisfied themselves that neither Kayla nor the other girls leveled these accusations against Zach out of malice; accordingly, Kayla's allegations may be best analogized to an informant's tip. While these allegations may have created a reasonable suspicion for Howell or Hayes to search Zach for weapons, without further investigation, they did not present "facts and circumstances . . . sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Criss,* 867 F.2d at 262. Unlike the principal in *Williams*, Hayes did not engage in any further investigation of Zach or his threats. Hayes did not necessarily need to spend days investigating the incident before concluding that he had probable cause, but Hayes could have conducted at least some minimal level of investigation in a short period of time that afternoon. Taking into account the totality of all the facts and circumstances of which Hayes was aware, there are enough factual disputes to permit a reasonable jury to conclude that Hayes, and Stevens through her supervisory role, violated Zach's Fourth Amendment rights by arresting him without probable cause.[7]

---

[7]Because I believe that Rhys's and Zach's Fourth Amendment claims should proceed beyond the summary judgment stage, Hayes's and Stevens's qualified immunity arguments must be taken into account. Public officers who perform discretionary functions "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The applicability of qualified immunity depends on: 1) whether the facts viewed in a light most favorable to the plaintiffs demonstrate that a constitutional violation occurred; 2) whether the

## B. Fourteenth Amendment Claims

The majority also errs in its determination that summary judgment was proper as to the § 1983 Fourteenth Amendment claims. The Fourteenth Amendment's guarantee of procedural due process requires that, for a suspension of no more than ten days, a school administration give a student notice of the charge(s) against him, an explanation of the evidence underlying those charges, and an opportunity to attend a hearing during which the student can present a defense. *Goss v. Lopez*, 419 U.S. 565, 581 (1975); *see also Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000) (citing *Goss* for principle that students cannot be suspended without an opportunity for a hearing). In general, the hearing, which can be informal, should occur before the student is removed from the school, although this is not necessary for a procedure to pass constitutional muster. *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1359 (6th Cir. 1996).[8] The parties chiefly

---

violation involved a clearly established right of which a reasonable officer would have known; and 3) whether the plaintiff adduced sufficient facts to prove that the officer's actions were unreasonable in light of the constitutional right. *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). I do not think it can presently be determined whether Hayes and Stevens are entitled to qualified immunity because "[s]ummary judgment is not appropriate if there is a genuine factual dispute relating to whether the defendants committed acts that allegedly violated clearly established rights." *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996); *see also Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) ("Summary judgment is not appropriate if there is a genuine factual dispute relating to whether the defendants committed acts that allegedly violated clearly established rights.") (quotation omitted).

[8]Under Ohio state law, a school board may suspend any student up to ten days, but it must give students written notice of the intention to suspend and must provide students with an opportunity to appear at an informal hearing and challenge the reason for the intended suspension. *See* Ohio Rev. Code § 3313.66(A)(1)-(2). The Cambridge Board of Education established its own suspension and removal guidelines under the auspices of § 3313.66(A). Under these procedures, a student may be

disagree over whether either student actually was suspended and not whether either student received adequate notice. The defendants do not contest the lack of notice because they argue that the parents of Rhys and Zach voluntarily kept them from school during the ten days they were allegedly suspended. Because I would hold that a genuine dispute of material fact exists regarding whether or not the school actually suspended the two students, I would reverse the district court.

## 1. Rhys

Taking the evidence in a light most favorable to Rhys, summary judgment should not have been granted. The majority points to some pieces of evidence that cut against Rhys's claim. Rhys never received any paperwork regarding a suspension, a fact that Howell and Lodge latch onto as proof that no suspension ever existed. Additionally, Rhys's mother stated that part of the reason for Rhys's absence was her reluctance to expose him to any backlash from his peers. However, when one views the evidence in a light most favorable to Rhys, as we must, genuine disputes of material

---

suspended by the Superintendent or a principal for up to ten days so long as there is notice of and opportunity for a preliminary hearing *before* the suspension is meted out. During this hearing the student must have a "full opportunity" to state why he or she should not be suspended. However, this preliminary hearing is not required if "a clear and present danger exists." Within one school day after the suspension, the principal must notify the student's parents about the reason for the suspension and notify them of their right to appeal. Then, a student may file a written appeal to the Superintendent within five days. The Superintendent can uphold the suspension, reduce it, or reverse it completely, but if he chooses to maintain the suspension, the student then has the opportunity further to appeal the suspension to the Board of Education within five days.

Additionally, for "emergency removal," a principal must provide a hearing concerning the removal "[a]s soon as practicable after a removal in excess of twenty-four (24) clock hours but within three (3) school days." J.A. at 348 (Cambridge Bd. of Educ. Procedures).

fact become evident. The absence of any paperwork regarding Rhys's suspension does not conclusively suggest that no suspension existed, particularly given Howell's inconsistent testimony regarding both the existence of suspension paperwork and his intent to suspend the two students. Furthermore, Rhys's mother did not keep Rhys out of school solely because she alone feared a backlash against Rhys; the principal, Mrs. Smith, advised her to keep Rhys out of school. It seems doubtful that the principal of the school would advocate a student missing ten days of school or even tolerate a student missing such a long period of time in the absence of some formal or informal suspension.

## 2. Zach

Zach presents even more evidence of a genuine factual dispute regarding the existence of a suspension. Bobbi LaCross, his mother, never received official notice of the suspension, yet on April 26, Howell made Zach sign a paper regarding the suspension and told LaCross "that Zach was going to be suspended; but if he was found not guilty, then the suspension would be canceled." J.A. at 617 (LaCross Dep.). LaCross asked Howell about appealing the suspension, and he responded that he would mail her the papers. After failing to receive the papers, LaCross called Lodge several times to complain; her conversations with him suggested that Lodge had seen the suspension papers and was frustrated that LaCross had not obtained them yet. Upon finally receiving the papers, long after the suspension period had ended, LaCross tried to appeal, only to be told that there was nothing to appeal because no suspension had ever issued. This sequence of events creates a factual dispute about whether the school officials either suspended Rhys and Zach without notice or constructively suspended them, by telling their parents that they were suspended, but not moving through the formal suspension process.

The majority also reasons that summary judgment was proper because even assuming that a suspension existed, the school satisfied the *Goss* due process requirements by giving Zach proper notice, an explanation of the evidence supporting the charge, and an opportunity for Zach to respond. Maj. Op. at 20-22. The majority reaches this conclusion based upon the brief conversation Zach and Howell had in Howell's office shortly before Zach was arrested. I cannot concur for two reasons. First, whatever the limited notice and opportunity for objection given to Zach, it occurred in the context of Zach's emergency removal, not his alleged suspension. Howell questioned Zach to determine whether Zach should be emergency removed from the school. Emergency removal is different than suspension; the former involves an immediate, limited duration expulsion from school, whereas the latter results in a longer absence from school. *See* J.A. at 348 (Cambridge Bd. of Educ. Procedures). While Howell may have given Zach the required process with regard to the emergency removal, the emergency removal reached its end point before Zach learned of his ten-day suspension. Assuming, as we must, that Howell actually suspended Zach conditioned upon the result of Zach's trial, Howell afforded Zach no opportunity to review the evidence or respond to the charges that prompted the ten-day suspension. The purposes of *Goss* would be defeated if a school were permitted to institute multiple suspension proceedings against a student, even if based upon the same incident, but only allowed the student to defend him or herself once.

Second, there is a factual dispute over how much of an opportunity Zach had to respond to the charges and evidence brought against him in the emergency removal "proceeding." While Howell suggests that Zach had a chance to respond and admitted to making threats, Zach presents a completely different recollection of the events of that afternoon. Zach stated in his deposition that he denied ever making the threats to Kayla. The majority again assumes, as it does throughout

its analysis, that Howell's testimony about Zach's "confession" is an accurate description of what actually occurred, but this presumption turns the summary judgment standard on its head; we must assume, for purposes of summary judgment, that Zach's story, not Howell's, is the correct one. Zach claimed that Howell did not give him much of an opportunity to defend himself, because Hayes arrested Zach before he could fully explain. While an "informal give-and-take between students and disciplinarian," *Goss*, 419 U.S. at 584, may constitute enough process to satisfy *Goss*, the parties dispute precisely how much informal conversation occurred between Zach and Howell. It is the place of the jury, and not this court, to reconcile these conflicting testimonies regarding whether Zach had enough of an opportunity to defend himself to satisfy *Goss*. Consequently, I do not agree that the district court should have granted summary judgment to the defendants.

### III. CONCLUSION

The issue presented to this court is not whether Rhys and Zach should ultimately prevail on the merits in their action against the defendants. The issue is whether, taking all the evidence in the record and the inferences from that evidence in the light most favorable to Rhys and Zach, genuine disputes of material fact exist that would permit a reasonable jury to find in their favor. Whereas the majority assumes facts to be true that are actually disputed, I believe that genuine issues of material fact surround Rhys's Fourth Amendment claim against Stevens, Zach's Fourth Amendment claims against both Hayes and Stevens, and both students' Fourteenth Amendment claims against Howell and Lodge. The district court thus erred in granting the defendants' motion for summary judgment. The school, police, and probation officials faced excruciatingly difficult decisions amidst the fear-drenched penumbra of Columbine, but in the presence of genuine issues of material fact, it is the task of the fact-finder to evaluate the significance of these

contextual factors to the determination of probable cause and the decision to suspend the students.  For these reasons, I respectfully dissent.